[No. 2492. Decided March 12, 1897.]

W. P. RAUCH, *Respondent*, v. A. C. CHAPMAN, *Treasurer of Klickitat County, Appellant.*

COUNTIES — CONSTITUTIONAL LIMITATION OF INDEBTEDNESS — EXPENSES
IMPOSED BY LAW — CURRENT EXPENSES.

The constitutional limitation of county indebtedness, in § 6, art. 8, of the state constitution, does not include the necessary expenditures made mandatory in the constitution and provided for by the legislature, and which are thereby imposed upon the county.

Liabilities incurred by a county in conforming to the constitution and laws of the state, and those current expenses which are necessary to the maintenance and life of the county government itself, are primary obligations, which of necessity always continue, and which are entitled to priority over liabilities incurred by the county for other purposes.

Appeal from Superior Court, Klickitat County.— Hon. SOLOMON SMITH, Judge. Reversed.

*W. B. Presby*, and *Huntington & Wilson*, for appellant.

*C. H. Spalding*, for respondent.

The opinion of the court was delivered by

REAVIS, J.—Suit in equity, by a taxpayer of Klickitat county, against the county treasurer to enjoin the payment of certain county warrants, on the ground

that they were issued after the constitutional limita-
tion of county indebtedness had been incurred. The
complaint, after other necessary allegations, set forth
that the indebtedness of the county was more than
one and one-half per centum of the taxable property
therein, and no validation by vote of the electors had
been made of any additional indebtedness. The
answer stated, among other defenses to the suit, that
the warrants in controversy were compulsory obliga-
tions imposed upon the county by the constitution and
laws of the state; and specified some of the purposes
for which the warrants were issued, among which
were services for jurors in the superior court, witness
fees in criminal proceedings, and sheriff's expenses
in serving criminal process, and expenses incurred
at the general state election. Plaintiff demurred to
this affirmative defense, which demurrer was sus-
tained by the superior court, and the court thereupon,
among other facts, found the following, which are
material to the consideration of the cause by this
court:

"7th. That the total indebtedness of said county on
the 9th day of March, 1893, and during all of the time
of the issue of the warrants now called was $85,441.92,
and greatly exceeded the constitutional limit of in-
debtedness for said county, after deducting therefrom
the cash in the treasury and all taxes levied and un-
collected.

"8th. That the warrants now called by the county
treasurer are the debts contracted after said 9th day
of March, 1893, and were issued between the 2nd day
of April, 1893, and the 26th day of July, 1893, during
all of which time said indebtedness of $85,441.92
was outstanding, and all of said warrants now called
were and are in excess of the constitutional limit of
indebtedness of said county and were issued without
the assent of the voters of said county first had and

obtained at an election held for that purpose, and they have not been validated by any vote of the electors of said county since their issue."

Judgment was rendered against the defendant and a permanent injunction issued against the payment of the warrants designated in the complaint. The defendant appeals.

1. Respondent maintains here that the payment of the warrants is inhibited by § 6 of art. 8 of the constitution of this state, of which the part material for consideration is as follows: "No county, city, town, "school district or other municipal corporation shall "for any purpose become indebted in any manner to "an amount exceeding one and one-half per centum "of the taxable property in such county, etc., with- "out the assent of three-fifths of the voters therein "voting at an election for that purpose. . . . "Provided, that no part of the indebtedness allowed "in this section shall be incurred for any purpose "other than strictly county, city, town, school district "or other municipal purposes;" and with the further proviso that any city or town shall be allowed to become indebted to a larger amount, not exceeding five per centum additional for supplying such city or town with water, light and sewers, when the works for supplying the same shall be owned and controlled by the municipality.

It will be observed that the question involved in this cause is the construction of the above section of the constitution. Without the aid of judicial interpretation which has been placed upon this or substantially the same constitutional provision in several state constitutions, we might be justified in reading the section plainly thus: "No county, etc., shall become indebted," and confine the reading to indebt-

edness incurred by the county itself. But evidently from the conflicting adjudications that have been rendered upon this question, the language of the constitution in this section is susceptible of more than one reading. Assuming this to be correct, we must endeavor to determine its true intent and meaning.

Judge COOLEY, in his work on Constitutional Limitations, pages 57, 58, observes:

" It is therefore a very proper rule of construction, that the whole is to be examined with a view to arriving at the true intention of each part; and this Sir Edward Coke regards as the most natural and genuine method of expounding a statute. If any section of a law be intricate, obscure or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another. . . . . The rule applicable here is, that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory. This rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court would be justified in declaring any portion of a written constitution nugatory because of ambiguity. One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."

And again the same authority, on page 37:

" ' What is a constitution and what are its objects? . . . . It is not the beginning of a community, nor the origin of private rights, it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits and modes of thought. There is nothing primitive in it; it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, a love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny. . .' "

When the constitution of Washington was adopted by the people of the newly-born state, the various county governments in the territory were recognized and their organizations and powers in a great measure continued. A large body of laws applicable to the new state, and which the people had for a long time been accustomed to, were found and continued in force. At this time some of the counties in the state were already indebted to an amount equal to the constitutional limitation of one and one-half per centum. The state itself inherited from its territorial form liabilities which very nearly equaled the limitation on state indebtedness prescribed in § 1, art. 8 of the constitution. The several counties, in addition to their organization for local purposes, and having conferred upon them the power to control and build county roads and bridges, erect public buildings for county purposes, and do many other things connected with the county as a corporation, also had imposed

upon them certain duties by the state, and became governmental agencies, in the territory comprised in the county, for the state.    Section 11 of art. 11 authorizes any county, city, town or township to make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws.    Section 12 of the same article provides:

"The legislature shall have no power to impose taxes upon counties . . . or upon the inhabitants or property thereof, for county . . . purposes, but may by general laws vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

The duty has been imposed upon the several counties in this state to provide for and pay certain necessary expenses for the enforcement of the criminal laws of the state and for expenses incurred at the regular biennial state elections at which county and state officers are elected, and in carrying out other functions of the state; and also to make expenditures necessary for the existence of the county organization.

Section 8, art. 6 of the constitution, provides for biennial elections.    Section 5, art. 11, also provides for the election in the several counties of boards of county commissioners, sheriffs, county clerks, treasurers, prosecuting attorneys, and other county officers as public convenience may require, and devolves upon the legislature the power to prescribe their duties and fix their terms of office, and to regulate the compensation of all such officers in proportion to their duties, and that for that purpose the legislature may classify the counties by population.

A similar limitation of county indebtedness as in this state is found in a number of the constitutions of the new states, and the limitation itself is of some-

what recent growth. It may well be inquired what were the conditions of counties or municipal corporations, and what was the mischief which caused the expression of these limitations in the organic laws of these states. A recurrence to the history of the times will show that many counties and municipalities had become largely indebted, beyond their capacity to pay, for public improvements of various kinds. In many of these states, for a considerable period of time, counties and municipalities aided railway building, and many of them became bankrupt by reason of the obligations and liabilities incurred in such aid of railway companies and various other public improvements which were deemed advantageous in the rapid development of the territory included within the county. Hence, another limitation upon the power of counties and other municipalities to incur indebtedness is found in these recent constitutions, which found expression in that of our state in § 7 of art. 8:

"No county, city, town or other municipal corporation shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association, company or corporation, . . . or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation."

2. The objects of government have usually become multiplied with the development of complex and artificial conditions of society. There is much controversy at times among our statesmen as to the necessary and proper limitations upon the powers of government, both state and municipal, but all are agreed that certain necessary fundamental functions of government must always be expressed and exercised. The protection of life, liberty and property, the con-

servation of peace and good order in the state, cannot remain in abeyance. These functions of government are elementary and indestructible. The constitutional convention which framed, and the sovereign people who adopted, a republican form of government for the state of Washington, had these known principles in mind. Section 10 of the Declaration of Rights prescribes: "Justice in all cases shall be administered openly and without unnecessary delay;" and in § 22 it is declared: "In criminal prosecutions the accused shall have the right to . . . have compulsory process to compel the attendance of witnesses in his own behalf, have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed. . . . ." Provision is also made in the constitution for the organization and maintenance of the county government and, as we have seen, its administration is ancillary to that of the state. All these provisions of the organic law are alike declared to be mandatory. It would make these various provisions of the constitution contradictory and render some of them nugatory, if a construction were placed upon the limitation of county indebtedness which would destroy the efficiency of the agencies established by the constitution to carry out the recognized and essential powers of government. It cannot be conceived that the people who framed and adopted the constitution had such consequences in view. The judicial power was vested in the courts; the law must be administered through them; the jury is an essential part of the judicial procedure; justice must be administered without unnecessary delay between the citizens of the state; persons accused of crimes must have a speedy and impartial jury trial; compulsory process must be served by the sheriff,

witnesses are compelled to appear. The regulation of much of this procedure, and the compensation of jurors and witnesses, as well as of officers, in the counties, is vested in legislative discretion. Section 1 of art. 9 of the constitution declares: " It is the paramount duty of the state to make ample provision for the education of all children residing within its borders;" and § 2, same article: " the legislature shall provide for a general and uniform system of public schools." Our constitution seems to have added to the proper and essential functions of free government the maintenance of public schools.

3. The construction by some of the other courts of similar constitutional provisions may here be examined. In *Grant County v. Lake County*, 17 Ore. 453 (21 Pac. 447), the court, referring to the constitution of Oregon, said :

" The constitutional inhibition that no county shall create any debts or liabilities which shall, singly or in the aggregate, exceed the sum of five thousand dollars, except to suppress insurrection or repel invasion, does not imply that all debts and liabilities against a county over and above that sum are necessarily obnoxious to that provision. To justify the court in finding the said conclusion of law, it should have found that the county *created* the indebtedness. Counties do not create all the debts and liabilities which they are under; ordinarily such debts and liabilities are imposed upon them by law. A county is mainly a mere agency of the state government — a function through which the state administers its governmental affairs — and it has but little option in the creation of debts and liabilities against it. It must pay the salaries of its officers, the expenses incurred in holding courts within and for it, and various and many other expenses the law charges upon it, and which it is powerless to prevent. Debts and liabilities arising out of such matters, whatever sum they may amount

to, cannot in reason be said to have been created in violation of the provision of the constitution referred to, as they are really created by the general laws of the state, in the administration of its governmental affairs.    Said provision of the constitution, as I view it, only applies to debts and liabilities which a county, in its corporate character, and as an artificial person, voluntarily creates."

This decision has been followed by the same court in *Wormington v. Pierce*, 22 Ore. 606 (30 Pac. 450); *Burnett v. Markley*, 23 Ore. 436 (31 Pac. 1050), and *Dorothy v. Pierce*, 27 Ore. 373 (41 Pac. 668).

The supreme court of California, in *Lewis v. Widber*, 99 Cal. 412 (33 Pac. 1128), observes:

" The respondent contends   .   .   .   that he should not pay petitioner's salary on account of § 18 of art. XI of the state constitution, which reads as follows : ' No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner, or for any purpose, exceeding any year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified voters,' etc.    It is quite apparent, however, that this clause of the constitution refers only to an indebtedness or liability which one of the municipal bodies mentioned has itself incurred, that is, an indebtedness which the municipality has contracted, or a liability resulting, in whole or in part, from some act or conduct of such municipality.    Such is the plain meaning of the language used.    The clear intent expressed in the clause was to limit and restrict the power of the municipality as to any indebtedness or liability which it has discretion to incur or not to incur. But the stated salary of a public officer fixed by statute is a matter over which the municipality has no control, and with respect to which it has no discretion; and the payment of his salary is a liability established by the legislature at the date of the creation of the office.    It, therefore, is not an indebtedness or lia-

bility incurred by the municipality within the meaning of said clause of the constitution."

In Texas the constitution requires that cities in creating debts shall at the same time, make provision for the payment of the debts by assessing and collecting a tax to pay the interest thereon and to provide a sinking fund to meet the principal. This requirement of the constitution has been held not to apply to debts created by the city for current expenses. *City of Terrell v. Dessaint*, 71 Tex. 770 (9 S. W. 593); *Biddle v. City of Terrell*, 82 Tex. 335 (18 S. W. 691).

Section 2786 of the Revised Statutes of Louisiana declares that the constituted authorities of incorporated towns and cities of the state "shall not hereafter have power to contract any debt or pecuniary liability without fully providing in the ordinance creating the debt the means of paying the principal and interest of the debt or contract." The supreme court of Louisiana, construing the inhibition in the above section upon a claim arising for payment of expenses of indigent small pox patients, which duty was imposed on the city by the state law, says:

" The debt on which this judgment is founded is for current municipal ·expenses; and we have held that debts for such expenses do not fall under the restrictions imposed by the statute referred to. *Laycock v. City of Baton Rouge*, 35 La. Ann. 479." *State, ex rel. Marchand, v. New Orleans*, 37 La. Ann. 13.

In *Grant v. City of Davenport*, 36 Iowa, 396, the supreme court of Iowa, says:

" Our constitution declares that 'no municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount in the aggregate exceeding five per centum on the value of the taxable property within such corporation.' . . . The plaintiffs aver in their petition the amount of

RAUCH v. CHAPMAN. 579

Mar. 1897.]        Opinion of the Court — Reavis. J.

the taxable property and also the amount of the city indebtedness upon bonds executed in compromise of a previous bonded debt, and show, by express averments, that the present indebtedness of the city is in excess of the constitutional limit. The direct question is therefore presented, whether the ordinance and its acceptance, which together constitute a contract, create an indebtedness by the city, in the sense of that word as used in the constitution. And we are not, by any means, inclined to limit or restrain the meaning of the word 'indebtedness,' as there used, so as to confine it to debts evidenced by bond or to those which are due simply, but rather to give to the word its fair and legitimate meaning and general acceptation. We have heretofore recognized and adjudicated the right and duty of a city to retain and apply its current revenues to the payment of its proper and ordinary current expenses; and this too, as against a judgment creditor, who demanded and insisted upon the application of such revenues to the payment of his judgment debt, then long overdue. *Coy v. The City of Lyons,* 17 Iowa, 1; *Coffin v. The City of Davenport,* 26 Id. 315. This right to thus apply the current revenues to the defraying of ordinary expenses is grounded upon the fact that such a course is absolutely necessary to the life of the municipality and to the successful accomplishment of the purposes of its creation. Any appropriation of these revenues, therefore, whether by ordinance or by contract, to the payment of the ordinary expenses, would be, beyond question it seems to us, both reasonable and proper." *Argenti v. City of San Francisco,* 16 Cal. 255; *Welch v. Strother,* 74 Cal. 413 (16 Pac. 22); *Smith v. Dedham,* 144 Mass. 177 (10 N. E. 782), which approves *Laycock v. City of Baton Rouge, supra; Barnard v. Knox County,* 37 Fed. 563.

In *Potter v. Douglas County,* 87 Mo. 239, suit was brought to recover from the county the sum of $450, on account of services performed by plaintiff as sheriff and jailor in keeping certain prisoners committed to jail by the court. Section 12 of art. 10 of the constitu-

tion of Missouri prohibited any political corporation
or subdivision of the state from becoming indebted
in any manner, or for any purpose, to an amount ex-
ceeding in any year the income and revenue for such
year without the assent of two-thirds of the voters
thereof. It was admitted that the county expenses
had exceeded the income and revenue for the year and
there was no assent of the voters to any increase.
The supreme court of Missouri says:

"The only point, then, for discussion, is the liabil-
ity of defendant in such circumstances as already set
forth. . . . The statute . . . makes it the
duty of the sheriff or jailor of a county to receive
prisoners . . . and safely keep them subject to
the orders of the judge of the court for the county
whence such prisoners are brought; . . . and an-
nounces a penalty for failure thus to bring the prison-
ers before the proper court for trial, and renders such
sheriff, etc., liable for imprisonment for contempt, and
also to a civil action for damages."

And another section of the statute "permits such
sheriff, etc., for such failure, etc., to be removed from
office and rendered incapable thereafter of holding the
same." The court continues:

"These sections are to be considered in connection
with § 12 of art. 10 of our constitution. . . . It
is manifest, if that section of the constitution applies
in cases of this sort, the predicament in which those
counties are placed which have neither jails nor suf-
ficient revenue, is a most lamentable one, bereft, as
they would be, of all means for the safe keeping of
that dangerous class of persons whose violations of
the law caused their arrest. . . . After carefully
considering the subject I am not of the opinion that
the constitutional prohibition should be ruled to ap-
ply in instances like the present. . . . I do not
regard § 12, *supra*, as applying here, because the effect
of such construction would be destructive of the peace

and good order in every county embraced within the
provisions of § 6090 aforesaid; for it would be an im-
possibility to submit to a vote of the people of the
county concerned, the question of an unascertained
and unascertainable indebtedness to be incurred in
the future, as the exigencies of the case might de-
mand. . . . It is not to be intended that those
who framed, or those who, by their vote, adopted our
constitution, contemplated or sanctioned any such
mischievous and destructive result. . . . Such a
construction, destroying, as it would, the very funda-
mental safeguards and bulwarks of organized govern-
ment and society, would be to attribute to the framers
of the constitution a most palpable absurdity; and by
an absurdity is meant that which is to be regarded as
morally impossible, which is contrary to reason, or,
in other words, which could not be attributed to men
in their right senses."

4. The constitution of Colorado, § 6, art. 11, provides:

"No county shall contract any debt by loan in any
form except for the purpose of erecting necessary pub-
lic buildings, making or repairing public roads and
bridges; and such indebtedness contracted in any one
year shall not exceed the rates upon the taxable prop-
erty in such county, following: [then specifying the
counties in gradation according to the taxable prop-
erty]. . . . and the aggregate amount of indebt-
edness of any county for all purposes, exclusive of
debts contracted before the adoption of this constitu-
tion, shall not at any time exceed twice the amount
above herein limited, unless . . . the question of
incurring such debt shall, at a general election, be
submitted to such of the qualified electors," etc.

The supreme court of Colorado, construing this sec-
tion of the constitution, holds that the limitation is
absolute, and that no liability can be incurred there-
under by a county for any necessary governmental
purpose, for expenses of courts, payment of jurors or
any other purpose. The court says:

"The limitation being applicable to all debts, irrespective of their form, it follows that, in determining the amount of county indebtedness at any time, county warrants are to be taken into the account, and any warrant which increases the indebtedness over and beyond the limit fixed is in violation of the constitutional provision, and void." *People v. May*, 9 Colo. 98 (10 Pac. 641).

But this construction of the constitution by the supreme court of Colorado has led, it seems, to some curious makeshifts by the legislature of that state, which have been approved by the court. Thus, in the case of *People v. May*, 9 Colo. 404 (12 Pac. 838), the court reaffirms that the limitation imposed upon county indebtedness by the constitution, § 6, art. 11, includes liabilities contracted by the county authorities under the direct authority of the legislature, as well as those contracted by them under their general statutory power. But, besides that, "a county which has reached the constitutional limit of indebtedness may constitutionally make assignments of the annual revenue accruing from taxes levied but uncollected for the current year, provided such assignments are not in excess of the amount covered by the annual levy for the year in which such assignment is made, and the warrant or instrument of assignment is expressly made payable out of the incoming revenue for the current year, and is an assignment *pro tanto without recourse* by the county of such fund." And thus it will be seen that the legislature of Colorado, in acts approved by the supreme court of that state, has found a method of prolonging the life of the counties and exercising the ordinary functions of government by making an assignment of a portion of the uncollected revenue of the county for the ensuing year without recourse back upon the county.

In the case of *Rollins v. Lake County*, 34 Fed. 845, the eminent judge, BREWER, construing the above section of the Colorado constitution, differed with the supreme court of the state, and held that necessary expenditures imposed upon the county by authority of the state were not within the inhibition of the constitution. But this case, on appeal, in *Lake County v. Rollins*, 130 U. S. 662 (9 Sup. Ct. 651), was reversed. In this case the supreme court of the United States, speaking by Mr. Justice LAMAR, says:

"We cannot say, as a matter of law, that it was absurd for the framers of the constitution for this new state to plan for the establishment of its financial system on a basis that should closely approximate the basis of cash. It was a scheme favored by some of the ablest of the earlier American statesmen. Nor can the fact disclosed in the bill of exceptions, that, after the adoption of the state constitution the county officials, and many of the people, designedly or undesignedly, disregarded the constitutional rule, render the plan absurd. If it was a mistaken scheme, if its operation has proved or shall prove to be more inconvenient than beneficial, the remedy is with the people, not with the courts."

In considering the distinguished authority which enunciated the above views, it is well to reflect that this cause came from the state of Colorado into the supreme court of the United States, and that the decision of the latter court might well be rested upon the ground that the same construction had previously been given to the constitution of Colorado by the state supreme court. It is true that many able statesmen have favored the establishment of a financial system for government upon a cash basis; but the fact that, while theoretically such a system is favored and doubtless is very desirable, it has never yet in practice

been done, occurs to us to be a powerful argument that practical statesmen in a constitutional convention, and the people in its adoption, would have the emergencies shown by universal history in view, rather than the disquisitions of philosophical writers upon this subject.

The supreme court of Missouri, in *Barnard & Co. v. Knox County*, 105 Mo. 382 (16 S. W. 917), in effect overruled the former case of *Potter v. Douglas County, supra*, but evidently upon the authority of *Lake County v. Rollins, supra*.

We are constrained to rule that the constitutional limitation of county indebtedness in § 6 of article 8 of our constitution, does not include those necessary expenditures made mandatory in the constitution and provided for by the legislature of the state, and imposed upon the county; that the payment of these is a prior obligation, and other liabilities incurred by the county are subject and inferior to these primary obligations which must of necessity always continue.

The cause is reversed and remanded to the superior court of Klickitat county, with instructions to proceed in conformity to the views expressed in this opinion.

SCOTT, C. J., and ANDERS, DUNBAR and GORDON, JJ., concur.