[No. 27346.  *En Banc.*  January 7, 1939.]

A. E. GOFF, *Appellant,* v. THE CITY OF SEATTLE *et al.,*
*Respondents and Cross-appellants.*[1]

[1]Reported in 86 P. (2d) 222.

*Weter, Roberts & Shefelman* and *Charles C. Hall,* for appellant.

*A. C. Van Soelen* and *J. Ambler Newton,* for respondents and cross-appellants.

*Preston, Thorgrimson & Turner, George D. Anderson, Arthur E. Simon, Newman H. Clark,* and *Claude E. Wakefield, amici curiae.*

GERAGHTY, J.—This action is brought by the plaintiff, as a taxpayer of the city of Seattle, on behalf of himself and other taxpayers similarly situated, to enjoin the city and its comptroller and treasurer from consummating the sale of funding bonds in the sum of three and a half million dollars, provided for in ordinance No. 68473, from the proceeds of which it is proposed to pay and retire an equal amount of outstanding city warrants issued to cover operating expenses of the city government.

It is alleged in the complaint that the warrants to be paid from the proceeds of the proposed bonds were, at the time of their issue, as well as at the time of the commencement of the action, in excess of the constitutional debt limit of the city permissible without a vote of the electors, and were, therefore, invalid and beyond the power of the city to fund them. The complaint further challenged a provision of the bonding ordinance which pledges a part of the city's permissible property tax to the payment of the funding bonds.

In their answer, the defendants admit their purpose to issue and sell the bonds provided for in the challenged ordinance without submission to the voters for approval, and, out of the proceeds, retire an equal amount of the city's outstanding general fund warrants issued between the 10th day of July, 1937, and the 1st day of June, 1938. Affirmatively, the answer detailed the various expenses for which the warrants were issued, and

alleged that they were all mandatory municipal expenses or expenses essential to the continued functioning of the city as a unit of government.

It is stated that there were warrants against the city's general fund outstanding and unpaid in an amount exceeding six million dollars, issued at various times from August 25, 1937, to August 10, 1938; that the general fund of the city has been on a warrant basis since October, 1931; and the deficit represented by the outstanding warrants, without deduction of anticipated revenues, due and uncollected, has been cumulative for a number of years; that, as a consequence, revenues provided to balance the various annual budgets since the beginning of the deficit had been substantially used to retire warrants issued for the expense of prior years.

It is alleged that, to properly and effectively carry on the city's essential functions at a reasonable cost, or at all, it is necessary that $3,500,000 of general obligation bonds, payable over a period of twenty years, be issued to fund a part of the outstanding warrants; and that, without the city's pledge of its permissible tax levy to service the proposed bonds, it is doubtful if they can be sold at all, or only at a high interest rate; but that, if such pledge be made, the bonds will be marketable at a low rate of interest, with resultant financial benefit to the city.

At the trial, the defendants admitted that the city had exceeded its permissible constitutional debt limit when the warrants to be funded were issued, but contended the warrants were valid obligations of the city because issued for mandatory services or services necessary and essential to the city's corporate existence.

Plaintiff, at the close of the defendants' evidence, narrowed his challenge to warrants representing the

following classes of service, in approximately the amounts stated:

| | | |
|---|---|---:|
| (1) | Legislative department, auto driver | $1,963.44 |
| (2) | Civil service department, expenses incurred in maintenance of Washington street employment office.... | 3,000.00 |
| (3) | Department of health and sanitation, maintenance of Firland tuberculosis sanatorium .............. | 216,581.86 |
| (4) | City Engineer's department: | |
| | (a) Ordinary maintenance of streets, roadways, walks, alleys, etc., approximately....... | 200,000.00 |
| | (b) Maintenance of automotive equipment of park department, approximately .............. | 8,500.00 |
| | (c) Maintenance of automotive equipment, etc., for Firland sanatorium, amount undetermined ..................... | |
| | (d) Maintenance of automotive equipment for library department, approximately ....... | 1,000.00 |
| (5) | Non-departmental expenditures: | |
| | (a) Dues paid to association of Washington cities ........... | 500.00 |
| | (b) Payments to King county humane society .............. | 18,396.15 |
| | (c) Reclassification survey expense for civil service department.. | 6,905.83 |
| | (d) Payment to park fund....... | 15,000.00 |
| | (e) Codification of city ordinances. | 3,000.00 |

The court sustained the validity of all the challenged expenditures, as being for mandatory services or services essential to the city's corporate existence, except those for the maintenance of Firland tuberculosis sanatorium, the payment made to King county humane society, and for the codifying of the city ordinances. The judgment sustained the validity of the bonding ordinance, except in so far as it provided for funding

warrants issued for the three classes of expenditure found by the court to be invalid, as to which the judgment enjoined the defendants, as prayed for.

The plaintiff appeals from the judgment in so far as it approves the funding of warrants issued for the classes of expenditure challenged by him, as well as from the provision sustaining the right of the city to pledge its permissible tax levy to payment of the bonds. The defendants cross-appealed from that part of the judgment enjoining the issuance of bonds covering the three classes of expenditure found by the court to be invalid.

We shall consider together the errors assigned severally by the appellant and by the respondents on their cross-appeal, based upon the court's ruling on the validity of expenditures to which challenges were made.

■ Section 6 of Art. VIII of the constitution provides:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, nor in cases requiring such assent shall the total indebtedness at any time exceed five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county purposes previous to the incurring of such indebtedness, except that in incorporated cities the assessment shall be taken from the last assessment for city purposes: Provided, that no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes: Provided, further, that any city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding five per centum additional for supplying such city or town with

water, artificial light, and sewers, when the works for supplying such water, light, and sewers shall be owned and controlled by the municipality."

Of this constitutional provision, it is said, in *Patterson v. Edmonds,* 72 Wash. 88, 129 Pac. 895:

"This clause of the constitution would seemingly render void any and all indebtedness incurred for any purpose which exceeded the limitations therein prescribed. This court has, however, laid down the rule that the limitation imposed has no application to such obligations as are made mandatory on the municipality by the constitution and laws of the state, or to such as are necessary to maintain its corporate existence."

This rule is recognized in the following additional cases:

*Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407; *Duryee v. Friars,* 18 Wash. 55, 50 Pac. 583; *Farquharson v. Yeargin,* 24 Wash. 549, 64 Pac. 717; *Hull v. Ames,* 26 Wash. 272, 66 Pac. 391, 90 Am. St. 743; *Gladwin v. Ames,* 30 Wash. 608, 71 Pac. 189; *Wolfe v. School Dist. No. 2,* 58 Wash. 212, 108 Pac. 442, 27 L. R. A. (N. S.) 891; *Pilling v. Everett,* 67 Wash. 109, 120 Pac. 873; *State ex rel. Taro v. Everett,* 101 Wash. 561, 172 Pac. 752; *McCarthy v. Kelso,* 129 Wash. 121, 223 Pac. 151; *Rummens v. Evans,* 168 Wash. 527, 13 P. (2d) 26; *Kruesel v. Collin,* 170 Wash. 233, 16 P. (2d) 442; *Robb v. Tacoma,* 175 Wash. 580, 28 P. (2d) 327, 91 A. L. R. 1010; *Weisfield v. Seattle,* 180 Wash. 288, 40 P. (2d) 149, 96 A. L. R. 1190; *Love v. King County,* 181 Wash. 462, 44 P. (2d) 175; *Sainer v. Thurston County,* 181 Wash. 552, 44 P. (2d) 179; *State ex rel. Keck v. Sunnyside,* 181 Wash. 511, 43 P. (2d) 621, 98 A. L. R. 741.

In the case last cited above, it is said:

"What may be considered obligations incurred in the performance of 'mandatory duties' and what expenditures may be considered as 'necessary to corporate

existence' is not always easy to determine, as an examination of the cited cases will show. While the criterion by which the question is to be determined is clear, the character of the obligation depends, in a large measure, upon the circumstances under which it is incurred."

Reviewing the cases where particular expenditures were involved, we find that, in the first, *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407, the court sustained an indebtedness in excess of the constitutional limit for payment of the services of jurors in the superior court, witness fees in criminal proceedings, expenses of the sheriff in serving criminal process, and expenses incurred at a general state election. Adverting to the constitutional provision, the court said:

"Without the aid of judicial interpretation which has been placed upon this or substantially the same constitutional provision in several state constitutions, we might be justified in reading the section plainly thus: 'No county, etc., shall become indebted,' and confine the reading to indebtedness incurred by the county itself. But evidently from the conflicting adjudications that have been rendered upon this question, the language of the constitution in this section is susceptible of more than one reading. Assuming this to be correct, we must endeavor to determine its true intent and meaning."

Citing other provisions of the constitution requiring the performance of public duties that only the county governments could execute, the court said:

"All these provisions of the organic law are alike declared to be mandatory. It would make these various provisions of the constitution contradictory and render some of them nugatory, if a construction were placed upon the limitation of county indebtedness which would destroy the efficiency of the agencies established by the constitution to carry out the recognized and essential powers of government. . . .

"We are constrained to rule that the constitutional limitation of county indebtedness in § 6 of article 8 of our constitution, does not include those necessary expenditures made mandatory in the constitution and provided for by the legislature of the state, and imposed upon the county; that the payment of these is a prior obligation, and other liabilities incurred by the county are subject and inferior to these primary obligations which must of necessity always continue."

In *Duryee v. Friars,* 18 Wash. 55, 50 Pac. 583, the rule announced in *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407, was reaffirmed.

In *Farquharson v. Yeargin,* 24 Wash. 549, 64 Pac. 717, the court permitted Ferry county to exceed its debt limit for the purpose of paying the salaries of county officers and for part of the expense of the construction of a new court house, necessitated by the creation of the new county, saying:

"At the time the court house was erected, such a county building was absolutely necessary for county officers and a proper care of the county records. Republic, the county seat, was a new mining camp, and but a short time before had been destroyed by fire. Most of the buildings were small frame cabins, none of them being suitable places to deposit the county records, or to accommodate the county offices."

The court was careful, however, to limit the authority of the decision to the exigent circumstances of that case, saying:

"While, ordinarily, warrants issued in payment of money expended in building a court house would not fall under the class of compulsory obligations, the conditions existing in Republic at the time of the erection of the court house were such as to bring the warrants for the erection of this particular court house within the rule laid down in *Rauch v. Chapman, supra,* because it may be fairly inferred that no other building could be had for the purpose owing to the destruction of the town by fire."

In *Hull v. Ames,* 26 Wash. 272, 66 Pac. 391, 90 Am. St. 743, the court held that the rule announced in *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407, permitting a county to exceed its debt limit for expenses necessary to the maintenance of its corporate existence, was applicable to municipal corporations, and sustained the validity of expenses incurred by the town of Cheney for the services of policemen, marshal, and city treasurer.

In *Gladwin v. Ames, supra,* where the court again had under consideration certain expenditures of the town of Cheney in excess of its debt limit, those for constructing a jail, boarding prisoners, feeding impounded stock, guarding quarantine patients, publishing notice of election, printing ballots, insurance on city buildings, services in making assessment rolls, city printing, postage and stationery for city officers, and expenses of the city clerk, were all held to be necessary for the perpetuation of the city's corporate existence.

In *Wolfe v. School Dist. No. 2,* 58 Wash. 212, 108 Pac. 442, 27 L. R. A. (N. S.) 891, the district had entered into a contract with a school teacher for eight months' service. She was discharged by the district, after three months' service, because of the exhaustion of district funds. She contended that keeping the school open for eight months was a mandatory duty of the district, for which an indebtedness in excess of the constitutional limit could be incurred. The court held that the maintenance of the school throughout the eight months' period was not such a necessity as would warrant the directors in overriding the statutory or constitutional debt limit.

In *Pilling v. Everett,* 67 Wash. 109, 120 Pac. 873, the legality of an issue of bonds to fund outstanding warrants of the city of Everett was involved. The bond issue was ratified by the voters of the city and was within

the five per cent indebtedness limit when voted, but certain of the warrants had been issued for city expenses incurred at a time when the city was indebted in excess of its permissible limit. One question in the case was whether indebtedness so incurred could be validated thereafter by the voters. The court said that it was not necessary to pass upon that question, since the warrants involved appeared to be valid, in any event, as having been issued for the salaries of the officers of the city and wages of other employees for services rendered by them in the necessary conduct of the city's ordinary affairs, or for materials and supplies furnished the city in connection with its ordinary affairs.

*Patterson v. Edmonds,* 72 Wash. 88, 129 Pac. 895, involved a bond issue to fund outstanding warrants issued for numerous city expenses which were challenged as in excess of the debt limit when incurred. In reversing a judgment approving the bond issue in its entirety, this court said:

"With this conclusion of the trial court, we have been unable to agree. There are, we think, many items of expenditure among those listed that clearly cannot properly be said to be necessary to the maintenance of the corporate existence of the city, and many more which, owing to the meagerness of the record, are at least in the doubtful class. Indeed, it would appear that the city authorities did not regard passing the indebtedness line as a matter of very serious moment. They apparently conducted the affairs of the city thereafter pretty much as they did before; expenditures being made and debts incurred for matters *pertaining rather to the general welfare of the city than to the maintaining of its mere corporate existence.* For example, a city dock was constructed at a cost of $6,-351.70; an indebtedness incurred for supplies and labor on the streets in the sum of $537; an indebtedness for city printing in the sum of $359; for supplies for the health officer in the sum of $78.50; for court fees in the sum of $220.55; for lighting the public buildings and

public streets in the sum of $1,179.37; for auditing the books of the city, $71; for sewer estimates, $123; for installing street lights, $136.10; for a typewriter, $102.50; for engineering expenses, $317.24; for killing dogs, $3; and for fees for various city officers, sums aggregating $3,316.51.

"Manifestly, if the city may lawfully become indebted for much of the foregoing after it has reached its limit of indebtedness, the constitutional prohibition has no meaning. The city dock is doubtless highly useful and convenient to the people of the city, and the cost of its construction permissible expenditure on the part of the city were it in a position to act for the general welfare of the people, but it is an absurdity to say that its construction was necessary to maintain the corporate existence of the city. So with the expenditures for work and supplies in the improvement and repair of the city streets. It might be that if some part of a street should become dangerous so suddenly as to require immediate attention, it would justify the incurrence of an indebtedness to repair it as a work of necessity; but certainly the injury caused by all ordinary wear and tear, the necessity to repair which can be foreseen for a period of time preceding the point of danger, can be repaired at the cost of property benefited without resorting to this extraordinary remedy. The items for auditing the books of the city, for sewer estimates, for installing street lights, for a typewriter, and for killing dogs, are clearly all expenditures relating to the welfare of the city rather than to the maintenance of its corporate existence. Moreover, it would seem that the work of auditing the books and of killing dogs could properly have been imposed upon some one or more of the officers of the city who were drawing a salary therefrom, instead of making it a charge upon the general fund. So, also, with regard to the expenditure for city printing, for supplies to the health officer, for lighting the streets, for court fees, for fees and salary of city officers; these might be justified up to a certain limit on the ground of necessity, but clearly all such expenditures as the city chooses to make in this behalf cannot be so regarded. Expenditures of this kind must be reduced

to a bare necessity, to those expenditures without the incurrence of which the city government cannot be carried on, before the expenditure is justified. So with other items of indebtedness not herein specially enumerated; they may or may not be legitimate expenditures, accordingly as they may have been incurred, or for mere public convenience." (Italics ours.)

We have quoted from this case at some length because it recognized the abuse to which a too literal application of the language employed in some of the earlier cases might lead. This thought is manifested in the court's comment:

"It is but justice to the trial judge to say that it rested its judgment on the authority of *Gladwin v. Ames, supra,* wherein this court sustained as legal certain indebtedness incurred by the town of Cheney, although issued after the town had reached its limit of indebtedness. It must be confessed that the opinion in that case contains language which, read apart from the record then before the court, would seem to justify as legitimate expenditures on the part of a municipality some of the expenditures which we have here condemned. But while we said in that case that the particular indebtedness incurred for the purposes specified were legitimate expenditures, it was not intended to be said that all such indebtedness as might be incurred for the purposes mentioned would be legitimate. For example, an indebtedness was there approved which was incurred for the purchasing of materials and the erection of a city jail; but, clearly, had the jail been an elaborate structure in excess of the immediate necessities of the city, the debt incurred would not have been legitimate. The case, however, even with its proper limitations, goes beyond any holding theretofore made by the court, and perhaps beyond a legitimate construction of the section of the constitution in question. We prefer, therefore, rather to curtail the rule as there announced than to extend it.".

The court's comment on *Gladwin v. Ames,* 30 Wash.

608, 71 Pac. 189, would be equally applicable to *Pilling v. Everett,* 67 Wash. 109, 120 Pac. 873.

In *State ex rel. Taro v. Everett,* 101 Wash. 561, 172 Pac. 752, the city had established a double platoon system in its fire department, which increased the expenses of the department above the amount budgeted for the purpose of the current year. The ordinance was attacked on the grounds that the city was indebted above its permissible limit, and that the increase in the fire department, without a budgeted appropriation and tax levy therefor, would result in a debt in excess of the constitutional limit. The court held that the maintenance of a fire department was a necessary expense within the rule announced in *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407, and succeeding cases, and that the extent of the personnel of the department was within the discretion of the city authorities, whose decision would be disturbed only where there was a manifest abuse of discretion.

In *McCarthy v. Kelso,* 129 Wash. 121, 223 Pac. 151, the court held valid a city indebtedness for the construction of a water filtration plant for the preservation of the health and lives of its citizens, notwithstanding the fact that the waterworks system was owned by the city in its proprietary capacity. Only three of the judges signed the majority opinion; two judges concurred on the ground that the city was charged with a mandatory duty to prevent and abate nuisances to protect the public health, and that the cost of so doing would authorize the creation of a debt beyond the limit fixed in the constitution. In that case, the state board of health had ordered the discontinuance of the use of water available to the city because of impurities, and that it had been agreed that there was no other method whereby wholesome water could be supplied.

In *Rummens v. Evans,* 168 Wash. 527, 13 P. (2d) 26, *Kruesel v. Collin,* 170 Wash. 233, 16 P. (2d) 442, *Love v. King County,* 181 Wash. 462, 44 P. (2d) 175, and *Sainer v. Thurston County,* 181 Wash. 552, 44 P. (2d) 179, the court sustained bond issues beyond the debt limit for care of the poor as a mandatory expense of county government.

In *Robb v. Tacoma,* 175 Wash. 580, 28 P. (2d) 327, 91 A. L. R. 1010, the facts were that the voters of the city of Tacoma had approved a bond issue for the construction, by the city of Tacoma, of an extensive sewer system. The project was approved by the three-fifths vote required by the constitution to authorize the debt. The legislature, however, had enacted Rem. Rev. Stat., § 5646-1 [P. C. § 5456-1], which provided that no general obligation bonds of any city or other enumerated municipalities, upon which a vote of the people is required, should be issued unless the total vote cast upon the proposition should exceed fifty per cent of the total number of voters voting in the municipality at the general county or state election next preceding the bond election.

The number of voters required by this section did not vote at the election, and the right of the city to issue the bonds was challenged in court by a taxpayer. The city, in its answer, alleged affirmatively the inadequacy of its sewer facilities and the resultant detriment to public health; that, for sometime past, the United States and state health officers had protested against the existing sanitary and trunk-sewer conditions in Tacoma, and had ordered the installation of adequate sewer facilities; that, to meet such demands, the city had submitted a plan for financing the construction of an adequate sewer to the electors, and that over three-fifths of those voting on the proposed bond issue ha voted in the affirmative; that the bonds were to be

to the Federal government, and that the city would thereby receive a grant of thirty per cent of the cost of the labor and material as a part of the government's plan to aid and encourage public work projects.

The trial court sustained a demurrer to the affirmative defense, and the city appealed. One of the city's contentions on appeal was that, regardless of the validity of the election, the bonds should be upheld, as the proposed improvement was necessary for the protection of the public health, imposing a mandatory duty upon the city which authorized the incurring of a debt without sanction of the voters. The judgment of the trial court was sustained in an *En Banc* decision concurred in by all of the judges. In the course of its opinion, the court distinguished the case from *McCarthy v. Kelso,* 129 Wash. 121, 223 Pac. 151, saying:

"There is quite a difference between the issuance and enforcement of orders, generally, to abate a nuisance or to prevent the spread of a threatened epidemic, on the one hand, and, on the other, an order compelling a city to install a vast sewage system necessitating a bonded indebtedness of three million dollars.

"Furthermore, we do not think that an emergency as contemplated by the statute and our decisions, is presented by the pleadings in this case. The condition complained of did not suddenly appear, but had been a recurring topic of discussion for a long time, as appears by the answer."

In *Weisfield v. Seattle,* 180 Wash. 288, 40 P. (2d) 149, 96 A. L. R. 1190, the court upheld a bond issue of the city of Seattle to pay back salaries to the members of the police and fire departments. The ordinance authorizing the bond issue was not submitted to a popular vote, and an action was brought to restrain the city from issuing the bonds. The court held the indebtedness not within the constitutional inhibition.

In *State ex rel. Keck v. Sunnyside,* 181 Wash. 511, 43 P. (2d) 621, 98 A. L. R. 741, from which we have al-

ready quoted, it was held that a drainage district assessment, levied upon the city of Sunnyside for special benefits accruing to the city by reason of the improvement, was a general debt and could not be imposed upon the city, or assumed by it, as a mandatory obligation, or as one necessary to its corporate existence, where the city was indebted in excess of the constitutional limit.

It is apparent, from our summary of the decided cases, that there are inconsistencies in their holding as to what expenditures are to be classed as mandatory or necessary to corporate existence. As a whole, however, there appears a manifest purpose on the part of the court to chart its course by the constitutional provision. The rule fairly to be deduced from the best considered of the decisions is that, to authorize the incurring of municipal obligations in excess of the debt limit, it is not enough that they be incurred for municipal purposes, convenient and useful, or broadly intended to promote the public good; the purposes must be such as are strictly essential to the continued existence of the municipality. It is within the power of a municipality to supply to the public a wide range of services and conveniences not essential to its corporate existence, but the cost of supplying them must be borne by resources available without the incurring of debt beyond the limit fixed by the constitution.

In our opinion, the case of *Patterson v. Edmonds,* 72 Wash. 88, 129 Pac. 895, announces the just and salutary principle that should control in passing upon the power of municipalities to incur expenditures in excess of the debt limit. In passing upon the expenditures in controversy here, it is to be remembered that they were made in 1937 and 1938, as like expenditures had been made in prior years, not to meet unforeseen emergencies, but for carrying on the normal and customary ac-

tivities of the city government. Apart from the inhibition on debt, they were proper expenditures in the sense that they were for municipal purposes and within the permissible powers of the city under its charter and the constitution and laws of the state. With the exception of fifteen thousand dollars for the park board deficit, they were provided for in the current annual budgets, and provision was made, by the levy of taxes and the allocation of other resources, to meet them. Warrants were drawn for their payment, chargeable to budget appropriations.

Under the ordinance challenged by the appellant, it is proposed to pay for these expenditures not out of the budget appropriations and the pledged resources, but by the sale of bonds and the creation of a general debt of the city in excess of its constitutional limit. The city is faced with a difficult financial problem, and it may be conceded, as the respondents contend, that the funding plan proposed would, in some measure, tend to alleviate the city's immediate financial stress. But the question before us is whether this can be done without a violation of the constitutional inhibition; more specifically, whether the expenditures to be paid out of the proceeds of the bonds were incurred in the rendition of mandatory or essential services.

We turn now to the challenged expenditures. The first was for the driver of the car used jointly by the city council, the planning commission, and other city bodies, in viewing proposed improvements, and in trips to the Skagit and Cedar rivers in connection with the city's light and water plants. We are unable to see any justification for this expense as within any permitted class; it is not mandatory, nor can it be said that the services of the driver, who appears to have been a sort of handyman, were essential to the

corporate existence of the city, especially in view of the fact that a share of his time was devoted to the city's proprietary operations.

The next item is the expense incurred by the civil service department in the maintenance of an employment office. Conceding this activity to be a proper expense payable out of the city's current revenues, we must, nevertheless, hold it not one made mandatory upon the city by superior authority nor essential to its existence.

The court disallowed expenditures for the maintenance of Firland tuberculosis sanatorium, and the respondents, on their cross-appeal, challenge the ruling. Of all the challenged items, this one makes the strongest appeal, in view of the services rendered and their relation to public health. That the maintenance of the sanatorium is within the powers of the city, is not to be questioned. As we have seen, it was provided for in the city's budget, and taxes were levied to meet its expense; but its operation is not made mandatory by the constitution or laws, nor can it be said, in any proper sense, that its operation is essential to the city's corporate existence. It appears from the record that no other city of the state supports such an institution, and the city of Seattle maintained its own existence without a sanatorium prior to the year 1912, when the institution was established.

Expenditures of the city's engineering department, aggregating approximately two hundred thousand dollars for maintenance of streets, alleys, roadways, and walks, are challenged. From the record, it seems that these expenditures were, more or less, for current street maintenance not mandatory nor essential to the city's corporate existence in a sense overriding the constitutional debt limitation.

The same may be said of other expenses incurred by the engineering department for maintenance of automotive equipment for the park department, Firland sanatorium, and the library department.

Certain expenses, denominated non-departmental, were challenged. These include items for dues paid to the association of Washington cities, which, the mayor testified, was of assistance to the city in obtaining a considerable sum of gas-tax money from the state, for codification of the city's ordinances, and for a reclassification survey made by the civil service department. We think these items should be disallowed. Without questioning the expenditures as proper charges against the city's current revenue, we cannot regard them as mandatory or so essential to the city's existence as to authorize an excess indebtedness.

The trial court disallowed an item for the support of the King county humane society. While the case of *Storey v. Seattle,* 124 Wash. 598, 215 Pac. 514, sustained the ordinance delegating certain functions to the society, we are in agreement with the trial court that, though the contribution may be a permissible expense, it is not one excepted from the limitations of the constitution.

The court allowed a warrant, in the sum of fifteen thousand dollars, representing an emergency appropriation to the park board to cover a deficit in the park fund, caused by expenditures for the purification of Green lake. It is stated in respondents' brief that a general fund warrant, into which this expenditure was covered, will likely be paid before a decision in this case is reached. Under these circumstances, we do not feel it necessary to pass upon this item of expense.

The respondents contend that all the services involved are authorized, if not made mandatory, by pro-

visions of the city charter, and, therefore, necessary to the corporate existence of the city. To sustain the validity of this contention would be equivalent to holding a city charter of higher authority than the state constitution. Under our constitution, the freeholders of cities of the first class are given the right to frame their own charters and to assume such powers as are permissible to cities, but always consistent with, and subject to, the provisions of the constitution and laws of the state.

█ The court upheld the provision of the bonding ordinance which pledges the city's permissible property tax levy to payment of so much of the bond issue as was determined to be valid. The appellant's assignment of error upon this provision of the judgment is disposed of adversely to his contention by *Love v. King County, supra,* and the case of *Richards v. Clark County, ante* p. 249, 84 P. (2d) 1009, only recently decided by this court.

It appears from the record that all of the expenditures involved here, with the exception of the item for the park department, are represented by outstanding warrants, the holders of which are not before the court. We are not passing upon the rights of these warrant holders as against the city's general fund and the revenues provided for their payment. We are passing only upon the right of the city to pledge its general credit and borrow money in excess of its debt limit to pay for the expenditures. As we have already seen, the expenditures were budgeted and taxes levied for their payment.

Section 9 of the budget law (Laws of 1925, Ex. Ses., chapter 125, p. 210), Rem. Rev. Stat., § 9000-21 [P. C. § 687e-9], provides:

"In computing the legal limit of indebtedness of any city, taxes levied for the purposes set forth in the

budget shall not be considered an asset, but shall be deemed for such purposes to have already been pledged and expended for the items set forth in the budget; Provided, that all taxes levied for the redemption of bonds or warrants or other public debt, shall be deemed a competent and valid asset of the city to be considered in the calculations of the legal debt limitations."

It would seem, if the taxes levied for budgeted purposes are not to be deemed cash assets in determining the city's debt limit, but rather as pledged and to be expended for budgeted items, that, conversely, warrants issued against this revenue should not be considered as the creation of a debt in excess of the constitutional limit, but, rather, as orders upon the city treasury for payment as and when the pledged funds accrue. This view seems to be supported by judicial decisions. If the rule were otherwise, it would be impossible for a municipality which had reached its debt limit to carry on. But we need not follow the question to a conclusion. We refer to it to negative any inference from our decision unfavorable to the validity of the warrants as a charge against the resources pledged to their payment.

The cause is remanded to the superior court, with direction to modify the judgment in accordance with the views expressed in this opinion.

STEINERT, C. J., MAIN, HOLCOMB, BLAKE, ROBINSON, and SIMPSON, JJ., concur.

MILLARD, J., concurs in the result.

BEALS, J. (dissenting in part)—As I understand our decisions, cities are held to a very high degree of care in the maintenance of their streets. In view of this principle, in my opinion, what may be called ordinary maintenance of streets has become a necessary govern-

mental function, as failure to maintain the streets in good condition may subject cities to heavy damages.

It is also my opinion that a city of almost half a million people may, as one of its governmental functions, properly maintain such an institution as the Firlands sanatorium, for the care of persons suffering from tuberculosis.

I am in accord with the majority opinion, save that I believe that the city should be allowed to include in the refunding bond issue the two items above referred to.

