[No. 41579.   En Banc.   January 7, 1971.]

PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, *Respondent,* v. TAXPAYERS OF SNOHOMISH COUNTY, *Appellants.*

THE CITY OF SEATTLE, *Respondent,* v. TAXPAYERS OF THE CITY OF SEATTLE, *Appellants.*

THE CITY OF TACOMA, *Respondent,* v. TAXPAYERS OF THE CITY OF TACOMA, *Appellants.*

PUBLIC UTILITY DISTRICT NO. 1 OF GRAYS HARBOR COUNTY, *Respondent,* v. TAXPAYERS OF GRAYS HARBOR COUNTY, *Appellants.*\*

\*Reported in 479 P.2d 61.

*Anderson, Hunter, Carlson & Dewell, James P. Hunter,* and *Thomas R. Collins,* for appellants.

*Parker Williams, Edward D. Hansen, A. L. Newbould, Arthur T. Lane, Marshall McCormick, Paul J. Nolan, Omar S. Parker,* and *The Attorney General* and *Robert Hauth, Assistant,* for respondents.

SHARP, J.—Appellants prosecute this appeal from a summary judgment upholding the right of respondent municipal corporations to participate with four privately-owned power companies in the construction, operation and financing of a coal-powered electric generating plant near Centralia.

The agreement[1] approved by the trial court was negotiated under the authority of RCW 54.44 declaring the public policy of permitting public and regulated private power agencies to participate together in the development of nuclear and other thermal power facilities. The project agreement provides that the municipal corporations are to own 28 per cent of the project and the privately-owned corpora-

[1] The agreement of the participants consists of a number of interrelated contracts covering construction, ownership, coal and water supply, output allocation, etc. They are collectively termed herein in the singular as the "agreement."

tions are to own the remaining 72 per cent. The agreement further provides that one of the private companies will construct and operate the facility, as agent of the respective parties, but that the annual operating budget must be approved by 75 per cent of the ownership. Subsequent capital expenditures are to require unanimous ownership approval. Until the year 1982 all power allocated to respondents will be purchased by two agencies of the federal government and revenues derived therefrom will be shared according to ownership interests in the plant. After 1981 each owner will be able to draw out its proportionate share of power generated by the facility.

The most serious challenge to respondents' participation in the project is based upon article 8, section 7 of the state constitution.[2] In asserting this challenge, appellants recognize that the agreement in question conforms to the detailed requirements of RCW 54.44 and therefore the challenge is addressed to the constitutionality of the statute itself. The genesis of this provision of our constitution is pertinent to the point in issue.

During the nineteenth century, state and local governments sought to obtain railroad linkage by the extension of public credit and loans for the development of railroad facilities. Typically, the planning of the facilities and the construction was left to the private companies involved. No public control was placed on the use of the public funds, nor were the railroads themselves subject to governmental regulation and control. In many instances this proved to be an improvident practice since, for example, many railroad lines were subsequently abandoned as unprofitable, leaving the local governments without recourse to recover their investments. For a review of this chapter in our nation's history, see Pinsky, *State Constitutional Limitations on*

---

[2] "No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation." Const. art. 8, § 7.

*Public Industrial Financing: An Historical and Economic Approach,* 111 U. Pa. L. Rev. 265 (1963); *State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis,* 41 U. Colo. L. Rev. 135 (1969). The result was the inclusion in many state constitutions of prohibitions similar to our article 8, section 7. Such prohibitions, however, did not preclude all financial agreements between public and private entities. Only those in which the public agency either (1) gives or lends its money or credit to, or in aid of, a private entity; or (2) directly or indirectly becomes the owner of stocks or bonds of the private entity, were prohibited. Appellant argues that the statute is unconstitutional in both respects.

█ The joint agreement before us, negotiated in strict conformity with the statute, does not constitute a loan of public money or credit to a private interest. In return for their investments, respondents receive ownership interests commensurate to the size of their investments. *Rands v. Clarke County,* 79 Wash. 152, 139 P. 1090 (1914). These ownership interests are amply protected by the terms and conditions of the agreement. But appellants argue that the financial participation of these public corporations in the project is "in aid of" private corporations, for it enables the private owners to obtain additional financing, otherwise unavailable. However, even if the private owners are "aided" by the respondents' participation, the issue is whether the aid comes in the form of gifts or loans of money or credit. We agree with the trial court's conclusion that the statute itself negates any such constitutionally prohibited gift or loan.

> In carrying out the powers granted in this chapter, each such city or public utility district shall be severally liable only for its own acts and not jointly or severally liable for the acts, omissions or obligations of others. No money or property supplied by any such city or public utility district for the planning, financing, acquisition, construction, operation or maintenance of any common facility shall be credited or otherwise applied to the account of any other participant therein, nor shall the undivided share of any city or public utility district in any

common facility be charged, directly or indirectly, with any debt or obligation of any other participant or be subject to any lien as a result thereof.

RCW 54.44.030. Respondents are purchasing an ownership interest, and not only is their liability limited to their own acts, but their investment is restricted to an indebtedness proportionate to their individual participation. There is no gift or loan of money or credit before us.

■ It is next urged that the statute and the joint-ownership agreement authorized thereunder violate that part of Const. art. 8, § 7, which provides that no municipal corporation shall "become directly or indirectly the owner of any stock in or bonds of any association, company or corporation." Appellants claim that the agreement constitutes the indirect ownership of stock in a private corporation by a municipal corporation, and the public agency's interest and right of control are essentially the same as a corporate shareholder. But this assertion overlooks the provisions of the agreement itself and the resulting relationship of the parties thereto. The agreement details the terms and conditions governing the construction, ownership, operation and maintenance of the project. Major management decisions are made by all participants, with the public participants having veto power. Furthermore, and significantly, the private participants themselves, are subject to regulation by the Washington Utilities and Transportation Commission. Far from being shareholders, subject to the overriding control of a shareholder majority, the parties hereto are tenants in common with clearly defined and enforceable rights to their respective project interests.

■ The appellants, nonetheless, contend that this provision not only prohibits ownership of stock in corporations, but also any type of joint ownership between public and private corporations. We cannot agree. The state constitution is not a grant, but a limit, on the legislature's law-making power. *State ex rel. Todd v. Yelle*, 7 Wn.2d 443, 110 P.2d 162 (1941); *Hoppe v. State*, 78 Wn.2d 164, 469 P.2d 909 (1970). The court is therefore reluctant to find a restriction on the legislature's power unless some limitation

is found in the wording of the constitution itself. Article 8, section 7 does not expressly prohibit public municipalities from entering into joint-ownership agreements with private enterprise. The constitutions of several other states have expressly done so. Arizona Const. art. 9, § 7; Colorado Const. art. 11, § 2; Delaware Const. art. 8, § 8. *Expressio unius est exclusio alterius.* (The express mention of one thing implies the exclusion of the other.)

Finding no restriction in the language employed, can it be said that this constitutional enactment fairly implies a prohibition against such joint ownership agreements. Stated another way: Is this agreement the type of business relationship to which the stock-ownership prohibition was directed?

The prohibitions of article 8, section 7 were originally directed at the public financing of private industries whose development bore little relationship to the public interest. Since the adoption of Const. art. 8, § 7, the nature of municipal functions has changed drastically. New means for financing public works have been required for municipal corporations to fulfill their responsibilities. *See* 2 Antieau, Municipal Corporation Law, § 15 A.05, p. 4565 (1969).

In the present case, the public participants gain the direct benefit of a power source to meet their undisputed future needs. Public need, as a primary purpose behind joint projects must, of course, be recognized. *See Whelan v. New Jersey Power & Light Co.,* 45 N.J. 237, 212 A.2d 136 (1965); *Miles v. Eugene,* 252 Ore. 528, 451 P.2d 59 (1969). We find the joint agreement to own and construct the project is in conformance with RCW 54.44, and does not violate Const. art. 8, § 7 of the constitution.

Appellants argue also that under *State ex rel. PUD 1 v. Wylie,* 28 Wn.2d 113, 182 P.2d 706 (1947), respondents' participation is arbitrary and capricious, since they seek to satisfy only future power and not present power needs. Appellants do not challenge respondents' determination that future power will be necessary for their districts; rather, they contend that future power needs do not justify present acquisition of power facilities.

■ In *Wylie*, we held that public utility districts have broad powers to acquire or construct additional power sources subject to the limitation that there be a reasonable need for the power so obtained. The PUD commissioners in *Wylie* made no claim that their district had a present or future need for additional power. This approach was again applied in *State ex rel. PUD 1 v. Schwab*, 40 Wn.2d 814, 246 P.2d 1081 (1952), in which defendant district was proposing to obtain additional power by acquiring a hydroelectric plant at Box Canyon. The purpose of the facility was to meet the district's future needs. In upholding the district's proposed acquisition, we said, at pages 823-24:

> It is the duty of the commissioners to make reasonable provision for the future requirements of the district. . . .
>
> It is obvious that such a forecast of future conditions requires the exercise of judgment which cannot be immediately vindicated by positive proof. It is the commissioners of the district who are given the duty of exercising judgment in such matters. If they perform that duty, and if it is not shown that in doing so they acted arbitrarily or capriciously . . . their determination must be accepted by the courts in passing upon the question of whether the proposed project is unreasonably large or entirely inappropriate.

Although respondents will sell their share of the power for 12 years, it is undisputed that the primary purpose behind their ownership is the acquisition of power for their future and foreseeable needs. Intermediate sale of power to the federal government is only a beneficial use of the temporary surplusage. *State ex rel. PUD 1 v. Schwab, supra.* Respondents' acquisition of ownership in the project is not arbitrary or capricious.

Finally, it is argued that the joint agreement contemplates an unlawful delegation of authority since it states that Pacific Power and Light Company, a private participant, shall manage the construction and operation of the plant. The premise upon which this claim is based is that the legislature delegated discretionary powers solely to the

respondents and that the agreement attempts to transfer these powers to a private agency. We do not agree.

The necessity of PUD commissioners assigning operational tasks to other bodies in contemplation of joint ownership projects was recognized in *Roehl v. Public Util. Dist. 1*, 43 Wn.2d 214, 261 P.2d 92 (1953). That case involved a joint agreement in conformance with RCW 54.16.200 among five public utility districts, which called for the joint planning and management of a system of power facilities. Each PUD placed one representative on a joint committee vested with the power to plan the system as well as construct and maintain it. We approved the agreement noting that "the designation of a management board seems especially necessary. It is, therefore, an arrangement clearly within the contemplation of the enabling legislation . . ." *Roehl v. Public Util. Dist. 1, supra,* at 241.

▮ The role of Pacific in the present case is a much narrower one than the role of the executive committee in *Roehl*. Its function is to construct and operate a single plant. The project's yearly operating budget is subject to approval by 75 per cent of the ownership interests. No additional capital expenditures can be made by Pacific without unanimous approval of the owners. Pacific has only those powers necessary for ordinary plant operation; assignment of such powers to a single body is clearly the only means by which joint owners can effectively operate and maintain the facilities. We find this arrangement not to be a delegation of the statutory powers given the respondents. Rather, it is an appropriate and necessary assignment of ministerial duties contemplated by the legislature.

The decision of the trial court is affirmed.

HUNTER, C. J., FINLEY, HAMILTON, NEILL, McGOVERN, and STAFFORD, JJ., concur.

ROSELLINI, J. (dissenting)—RCW 54.44.020, which authorizes public utility districts to enter into agreements with electrical companies for the undivided ownership of nuclear and other thermal power generating plants and for

the planning, financing, acquisition, construction, operation and maintenance thereof, provides:

> It shall be provided in such agreements that each city or public utility district shall own a percentage of any common facility equal to the percentage of the money furnished or the value of property supplied by it for the acquisition and construction thereof and shall own and control a like percentage of the electrical output thereof.

If the public utility district owns a percentage of the facility, it owns a share of it. I can conceive of no substantial difference between the ownership of such a share and the ownership of stock in such a facility. The statute does not forbid the public utility district to delegate to the electrical company the right to manage the business, and that has been done in this case. An owner of shares in a corporation has essentially the same interest in the corporation and its property and the same right of control as the public utility district has in this case.

To my mind, it is inescapable that RCW 54.44 is a legislative attempt to avoid the prohibitions contained in Const. art. 8, § 7. *That provision says that no municipal corporation shall become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.* I can read in this language nothing less than a clearly expressed intent that municipal corporations shall not become involved in projects with private enterprise. The majority concedes that it was the unfortunate experiences resulting from such involvements which prompted the adoption of the provision. They seem to take the view, however, that the dangers which existed in territorial days with regard to involvements with private enterprise no longer exist. This may be true, and it may also be true that it is extremely desirable that municipal corporations should be allowed to participate with private companies in the development and sale of nuclear power and in other projects. If so, that is cause for amendment of the constitution, but that amendment should be effected by the people, using the amendatory process prescribed in the constitution.

Amending that document is not a proper function of this court.

The principle upon which the majority rests its decision that RCW 54.44 does not offend Const. art. 8, § 7, appears to be this: A municipal corporation may join with a private company in the development of a resource or construction of a project if a public purpose is served thereby. Significantly, the majority cites no case so holding. On the contrary, this court has always refused to accept that concept when it has been argued. In *Johns v. Wadsworth*, 80 Wash. 352, 354, 141 P. 892 (1914), it emphatically rejected a contention that the constitutional provision was intended only to forbid the aiding of private enterprises which serve purely private purposes. In that case a county proposed, pursuant to a statute authorizing it to do so, to give money to a county fair association for the holding of a fair which concededly would benefit the county. The statute provided that any buildings erected with the funds would become the property of the county. This court said:

> If the framers of the constitution had intended only to prohibit counties from giving money or loaning credit for other than corporate or public purposes, they would doubtless have said so in direct words. That agricultural fairs serve a good purpose is not questioned, but the constitution makes no distinction between purposes, but directly and unequivocally prohibits all gifts of money, property, or credit to, or in aid of, any corporation, subject to the exception noted. In *Rauch v. Chapman*, 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407, after referring to § 7, art. 8, of the constitution, this court said that a recurrence to the history of the times will show that many municipalities had become bankrupt because of liabilities incurred in aid of railroads, "and various other public improvements which were deemed advantageous" at the time.

That case was quoted with approval in *State ex rel. Wash. Nav. Co. v. Pierce County*, 184 Wash. 414, 51 P.2d 407 (1935). Recently, in *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 399 P.2d 623 (1965), we held that a municipal corporation may not expend its funds to entertain prospective customers, even though such expenditures

may be considered beneficial in the conduct of the corporation's duties and functions. We quoted at length from *Johns v. Wadsworth, supra.*

It is true that those cases involved the first clause of Const. art. 8, § 7, pertaining to giving gifts and lending credit. That clause does contain one exception, namely, gifts for the support of the poor and infirm. The second clause, dealing with the acquisition of an interest in a private corporation, contains none. What was said in those cases regarding the first clause is, if anything, even more applicable to the second clause.

The only Washington authority cited by the majority in support of its statement that jointly owned projects do not offend the constitution is *Rands v. Clarke County,* 79 Wash. 152, 139 P. 1090 (1914). In that case this court held that the legislature might authorize a county to join with another county in the construction of a bridge. However, as that opinion pointed out, the other party to the enterprise was not a private corporation but rather a corporation whose functions were wholly public. Furthermore, the county had the right and duty to superintend and control the construction of its portion of the bridge. Thus, the case differed from this in at least two significant respects. It does not stand for the proposition that a public corporation may constitutionally enter into a joint enterprise with a private association, that enterprise to be superintended and controlled by the private association.

The majority appears to make some distinction between regulated private corporations and nonregulated corporations. The fact that a corporation is subject to governmental regulation does not make it any the less a private corporation. The constitution does not make the distinction drawn by the majority, any more than it draws a distinction between gifts for public and private purposes.

I would hold, in accord with the past opinions of this court and the clearly expressed intent of the framers of the constitution, that RCW 54.44 is contrary to the mandatory provisions of Const. art. 8, § 7, and cannot stand.

HALE, J., concurs with ROSELLINI, J.

HALE, J. (dissenting)—Long before they could put a name to their fears, the people of this commonwealth took steps to prevent the emergence of a corporate state. They brought into the Union a constitution designed wholly to keep all ultimate powers of government in the hands of the people, powers to be exercised only by elected officers or appointed officials—and later, through initiative, referendum and recall, directly by themselves. To a charter patterned largely after the federal constitution, they added explicit provisions designed to forestall the very dangers arising from the threat of concentrated economic and political power and monopoly implicit in the rise of giant corporations after the Civil War and the extension of the railroads across the continent into the West. They were aware of the lurking dangers to a free Western society inhering in the consolidation of government with the great private corporations, and sensed that these dangers were not completely overridden by promised lower prices, improved service and increased efficiency. They meant to obviate these hazards by writing safeguards into their constitution. From time to time, the people added specific provisions to the constitution forbidding the commingling of governmental power, property and money with that of private corporations, reserving to themselves through the initiative, referendum and recall direct legislative powers. RCW 54.44 and the contracts here made under it, in my judgment, violate the state constitution to accomplish what it was designed to prevent. I therefore dissent.

I concur with Mr. Justice Rosellini that RCW 54.44 purports to allow the gift of money or property and the loan of money or credit to *or in aid of a private corporation* and that the joint ownership and operation of the Centralia thermal project places the City of Seattle, the City of Tacoma, and the two public utility districts in indirect ownership of stocks or bonds of private corporations. The statute, therefore, and the contracts by which it is applied, are, as pointed out in the dissenting opinion, repugnant to Const. art. 8, § 7.[3] This section of the constitution allows for no

[3] "No county, city, town or other municipal corporation shall here-

exception unless the gifts, loans of money, credit or property are "for the necessary support of the poor and infirm" —a status for which I doubt Pacific Power & Light Company, Washington Water Power Company, Puget Sound Power & Light Company, or Portland General Electric Company can jointly or severally qualify. Accordingly, I have signed the dissenting opinion.

In addition to those grounds of unconstitutionality stated in the dissenting opinion, the scheme has, I think, other fatal constitutional and statutory infirmities which require that it be more fully examined. We begin with the four publicly-owned systems instigating what seems to be a major reversal of a long established public policy designed to encourage the public ownership and operation of public utilities. The constitutionality of the statute and validity of these contracts have been litigated not in the light of that policy but rather in a more or less academic action brought by the proponents of the scheme seeking a declaratory judgment of validity for the bonds which the four public entities will sell in order to raise the money with which to buy into the Centralia thermal project.

This litigation, to test the validity of municipal revenue bonds, began with four separate actions brought by Grays Harbor County Public Utility District No. 1 in the Superior Court for Grays Harbor County, the City of Tacoma in Pierce County, the City of Seattle in King County, and Snohomish County Public Utility District No. 1 in Snohomish County as individual plaintiffs. Each complaint, asking that a taxpayer or ratepayer be appointed to defend, sought a declaratory judgment sustaining the proposed bonds. The four respective superior courts granted these applications for appointment and the Grays Harbor, Pierce and King County causes were by stipulation consolidated with the case then pending in Snohomish County. So far as

after give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation." Const. art. 8, § 7.

I can ascertain, there was no separate appearance by individual counsel for the appellant taxpayers-ratepayers in either Grays Harbor County, or the City of Tacoma, or the City of Seattle. The entire burden on behalf of the citizenry at large was undertaken by counsel for appellant Snohomish County ratepayer-taxpayer who, by agreement with the other three appellants, was designated as counsel for all adverse parties.

In the consolidated case, counsel representing the taxpayers-ratepayers of all the four publicly-owned legal entities filed an amended answer to the four complaints which had been separately filed at the outset by the two cities and the two public utility districts. When the motion for summary judgment was argued, counsel for the appellants made it clear that the primary purpose of the case was to test the validity of the revenue bonds which would be sold by respondent publicly-owned utilities.[4]

Although I do not disparage the industry, learning or devotion of counsel, it seems manifest to me that a case of such public importance—involving as it does some 50 million dollars, plus interest thereon in public funds—would better have been litigated jointly by counsel from Grays Harbor, Tacoma and Seattle in conjunction with counsel of record. Counsel from each respective district should have been appointed for the taxpayers-ratepayers of Grays Harbor County Public Utility District No. 1, the City of Seattle and the City of Tacoma, and required to stay in the case throughout all its stages. I find no tenable reason why this was not done, for each of the respondent publicly-owned utilities in its complaint described the moneys ultimately to be consigned to the joint ownership scheme as surplus funds, and promised to pay all counsel fees.

---

[4] "MR. HUNTER: . . . the purpose of this action, which is to eventually test out the validity of any bond issue that may be made, for the purpose of financing the contributions made by the public utilities into this project and inasmuch as the Court is no doubt aware of that, many issues that have been raised by the taxpayers and discussed in the taxpayers' brief are there because counsel for the bonding companies involved wanted them raised."

Issues formulated by counsel for the taxpayers-ratepayers in their answer set forth affirmative defenses challenging the statute (RCW 54.44), and the contracts in issue as an unconstitutional and illegal expenditure of surplus public funds, primarily (1) because they constituted the giving of money or property, or the loaning of money or credit in aid of private corporations; (2) because these expenditures of public funds will make the respondent cities and public utility districts owners of stock in private corporations; and (3) because they carried out an illegal delegation of legislative and administrative power to private corporations.

The first two of these three affirmative defenses, I think, have already been vindicated and established in the dissenting opinion. The third one, that of unlawful delegation of power, inheres in other aspects of unconstitutionality and invalidity raised by the pleadings and the record, not all of which were argued to the trial court but which must be considered.

Legislative authority is vested in the legislature. "It is unconstitutional for the legislature to abdicate or transfer to others its legislative function." *Keeting v. Public Util. Dist. 1*, 49 Wn.2d 761, 767, 306 P.2d 762 (1957). Even in delegating administrative power—as distinguished from legislative—to *public* officers and agencies, the authority must be specifically prescribed and delimited. *Keeting v. Public Util. Dist. 1, supra.* Obviously, appellants were so confident that the three issues raised by their answer were determinative, that many other presumptive points of unconstitutionality and invalidity were not raised before the trial court nor in this court. Synthesizing these ingredients of invalidity not covered in the dissenting opinion with the affirmative defense of illegal delegation, I think that, in addition to the two major grounds, the statute (RCW 54.44), and the contracts show other solid points of unconstitutionality and invalidity. More explicitly, illegal delegation of power raised by the affirmative defense is but a component of several other phases of illegality suffusing the entire scheme.

First, joint ownership and joint operation of the Cen-

tralia thermal project by private corporations and government not only amount to an illegal direct delegation of governmental power as pleaded in the affirmative defense, but are repugnant to the whole concept of self-government perpetuated through the state constitution by the people of this state when we entered the Union. That constitution reserved to the people in a structure of representative government all essential powers of self-government necessary for the preservation of a free society. Article 1, section 1, of the state constitution says "All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights." The people intended to exercise this power of government by preserving the familiar division of authority, dividing the mechanics and powers of government—with a few inconsequential exceptions—into three separate but coordinate branches: The legislature (article 2), the executive (article 3), and the judiciary (article 4), and reserving to themselves the power of amendment as an ultimate safeguard. Amendment 7 declared anew the legislature's authority, but imparted to the people the rights of initiative and referendum.

Nowhere in the entire constitutional scheme of government can one find where any of these sovereign powers or functions even in part may be shared with, ceded to, transferred, assigned, sold or delivered into the hands of private parties or corporations. The concepts of free government underlying the whole state constitution are inimical to any ideas that the state government or its political subdivisions can lawfully turn over any part of its domain or property to the ultimate control or dominion of private persons or corporations—or to any entity not an integral component of the three coordinate branches of government. Considering the constitution as a whole, and in conjunction with many sections of it which explicitly prohibit the amalgamation of public money and property with that of individuals and corporations, the point is subject to little doubt. Although it has been said many times that the state constitution is a limitation and not a grant of power (*In re Elliott,* 74 Wn.2d

600, 446 P.2d 347 (1968)), the constitution and all it stands for prohibits, I think, using public funds with which to buy into and engage in business operations as a partnership with private business.

Ultimate sovereignty under our constitution, we have said, remains with the people, unless the people have themselves surrendered it to a higher sovereignty. *Love v. King County,* 181 Wash. 462, 467, 44 P.2d 175 (1935). In turning sovereign control of a segment of the public treasury and the management of their property directly over to Pacific Power & Light Company and indirectly into the hands of the other three private corporations, I do not think that it can be said that the people's representatives and agencies either sought or found a higher sovereignty.

Thus, the joint ownership and operation of the Centralia thermal project violates the concepts of state government as established by the whole constitution and engenders an illegal and unconstitutional delegation of sovereign powers and duties to four private power companies in general and to Pacific Power & Light Company in particular. If we lay the entire scheme upon the constitution as a whole, I think it is clear that substantial powers of government are being transferred to private corporations. The contracts bind the four publicly-owned entities to buy coal continuously for at least 35 years and to sell all of their share of the power output to Pacific Power & Light and to agencies of the United States for at least 10 years. The four publicly-owned entities accord to Pacific Power management, control and dominion over the Centralia thermal generating plant and assure to the majority owners thereof—the four private power companies comprising a strong majority—a continuous supply of water as long as the coal shall last. The contracts give Pacific Power the authority to hire and fire operating personnel, buy all materials, pay all bills from common joint enterprise funds and do all things needful to the operating and control of a joint venture which would include bringing to bear upon other agencies of government whatever influences are deemed beneficial to the joint venture. These, however, are but the general invalidi-

ties visible on a panoramic view. There are others, I think, in sharp silhouette when we examine the scheme in detail.

A look at the specifics of the contracts and statute will highlight their unconstitutionality. The contracts bespeak an intention and purpose of four private power companies, along with two of their wholly-owned subsidiaries, to effect a binding and inseparable relationship with four wholly-public entities. They fuse government and private business together by means of four separate but interrelated formal contracts, 262 pages long, binding and indissoluble, until the coal runs out—a period estimated to be at least 35 years and perhaps longer, depending on future conditions. Setting up a declared joint venture, the scheme actually, I think, creates a copartnership among the four privately-owned corporations consisting of Pacific Power & Light Company, a Maine corporation, Washington Water Power Company and Puget Sound Power & Light Company, Washington corporations, and Portland General Electric Company, an Oregon corporation, and the four publicly-owned governmental entities consisting of the Cities of Seattle and Tacoma, Grays Harbor Public Utility District No. 1, and Snohomish County Public Utility District No. 1. Two of the partners—or joint venturers—the public utility districts, do not have general powers of government, but Seattle and Tacoma not only generate, distribute and sell electricity but possess as cities in one degree or another all such sovereign police powers as may constitutionally be delegated by the sovereign state to its cities and identified with the executive, legislative and judicial branches of government. The joint venture, as it is styled—but which has the indicia of a copartnership since it is a continuing operation—is bound together by four principal contracts: The construction and ownership agreement; the operations agreement; the coal supply agreement; and the water supply agreement; and lesser contracts providing for disposition of electric output to agencies of the United States and Pacific Power for a fixed period.

There are some rather curious aspects to the arrangement not ordinarily found in a joint venture or copartner-

ship arrangement. The coal supply agreement recites that Pacific Power wholly owns Western Resources, Inc., its subsidiary, and Washington Water Power has a wholly-owned subsidiary called Washington Irrigation and Development Company. The two subsidiaries in turn own, control and have the mining rights to all of the coal which will be sold to and used by the joint venture or partnership as fuel for the Centralia steam plant. The four private corporations, the two cities and the two public utility districts agree conjointly to build, own and operate the thermal generating plant and sell its output as a single entity. Ownership is indivisible and inseparable. Except for the coal deposits owned and controlled by the two subsidiaries, the four private and the four public legal entities as tenants in common shall own all of the equipment, materials, supplies, property and real estate and shall share the avails of distribution of output and the benefits and the losses in the following percentages:

| | | | |
|---|---|---|---|
| Pacific Power | 47.5% | Grays Harbor PUD. | 4% |
| Washington Water | | Snohomish PUD ... | 8% |
| Power | 15 % | Seattle | 8% |
| Puget Sound Power | 7 % | Tacoma | 8% |
| Portland Gen. Elec. | 2.5% | | |
| | | Total, Public | 28% |
| Total, Private | 72 % | | |

Under the four major contracts, each entity will share the costs of construction and operation and pay for the cost of the delivered coal, and share the net revenues and benefits and presumably the losses, too, in proportion to its stated percentage of ownership. The contracts are designed to be irrevocable during the life of the coal fields, but ownership of the coal fields is not shared; the fields will remain the property of the two subsidiary corporations.

All of the owners in the construction and ownership agreement, although they are tenants in common, undertake expressly to waive their right to ever demand a dissolution of the partnership, and to waive any rights to bring suit for partition of the jointly owned real estate so long as the Centralia thermal project "is used or is useful for the

generation of electric power and energy." The scheme also contemplates that additional generating units will be constructed in the future to be financed, owned and operated as a part of the partnership scheme. And the construction budget and operating budget may be revised only when approved "by the Owners having combined ownership percentages of not less than 75%." Since the private corporations own 72 per cent and the public entities the remaining in the ratio of 4, 8, 8 and 8 per cent for a total of 28 per cent, the entire project will in effect be privately controlled. The inability of the future city councils of Seattle and Tacoma to dissolve the scheme or revise the operating budgets without courting the consequences of breach of contract or liability in equity constitutes, in my view, a significant cession of governmental powers to the private corporations.

There are other cessions, too.

The eight entities agree, in the construction and ownership agreement, that all disbursements for construction costs shall be made by only Pacific Power & Light Company from a fund called the Centralia Construction Trust Account into which coowners each shall contribute from time to time, according to their percentage of ownership. Pacific and Washington Water Power undertake to establish and maintain a minimum balance in this account of $100,000—a modest undertaking when considered in relation to a total cost estimated at between 200 and 250 million dollars, not counting the value of the coal, or interest on the bonds. Thus, in lieu of appropriations made from time to time by the legislative bodies of Seattle and Tacoma for specific expenditures to be disbursed according to vouchers filed with the public treasury, the four publicly-owned utilities will be paying public funds into a privately controlled treasury which in turn will be disbursed on privately executed vouchers.

At this juncture, one discerns another oblique departure from the constitution. Amendment 11 declares that "No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its manage-

ment, except in pursuance of an appropriation by law . . ." Although this proviso relates expressly to the state, it is unlikely that the courts would or should under the state constitution allow the state's political subdivisions to spend public moneys except by appropriation, either. This is especially apparent when amendment 11 is read in pari materia with that section declaring public policy concerning municipal corporations:

> The making of profit out of county, city, town, or other public money, or using the same for any purpose not authorized by law, by any officer having the possession or control thereof, shall be a felony, and shall be prosecuted and punished as prescribed by law.

Const. art. 11, § 14. I do not suggest that the four public entities will not have complete access to all of Pacific's records, or that the scheme contemplates that somehow the public moneys will be misappropriated for private use. What is apparent, however, is that the moneys paid into the trust account in particular and invested in the scheme in general *will be subject to the immediate control and dominion of a private corporation and* in the ultimate *inure to the private use and benefit of the four private corporations.* To that extent, public funds become private money—public money ultimately utilized in the profit-making processes of the private corporations.

Thus, the contracts do call for continuing investment of public moneys for 35 years without appropriation, and will be used in part to provide or assure a profit to the four private corporations. Since the eight entities agree that, even though they are tenants in common, they will never partition the jointly-owned property so long as the thermal plant is useful for the generation of electricity, it is inevitable that a substantial segment of the public treasury will remain privately operated and controlled for at least 35 years,[5] or presumably until the coal supply runs out.

---

[5]*"Waiver of Right to Partition*

"(a) The Owners and each of them shall accept title to the Project, as tenants in common, and agree that their interests therein shall be held in such tenancy in common.

"(b) So long as the Project or any part thereof as originally

Should the four public entities, having undertaken to contribute their share of money necessary to keep the operating fund solvent during the life of the contracts, fail to appropriate whatever funds are required, they will suffer the penalties and forfeitures of a breach of contract and perhaps even more drastic remedies in equity.

The next of the four contracts, referred to as the operations agreement, contains even more salient points of unconstitutionality than does the construction and ownership agreement. In the operations agreement, all eight entities, private and public, designate Pacific Power & Light Company as the operator of the project with control, dominion and direction over the continuing construction, maintenance and operation.[6] The contract expressly states that "All persons employed in the operation and maintenance of the Project, other than employees of independent contractors, shall be Pacific employees and shall not be considered to be employees or agents of any of the other parties." To delegate in this fashion control, dominion and direction over the real and personal property owned by the two cities and the two public utility districts, in my judgment, carves these functions away from government and works a corresponding transfer of governmental power to private corporations. It removes these functions from the classified civil service, too, to the detriment of the governmental units and their employees—a point which will be consid-

constructed, reconstructed or added to is used or useful for the generation of electric power and energy, or to the end of the period permitted by applicable law, whichever first occurs, the Owners waive the right to partition whether by partitionment in kind or sale or division of the proceeds thereof and agree that they will not resort to any action at law or in equity to partition and further waive the benefit of all laws that may now or hereafter authorize such partition of the properties comprising the Project." Agreement for the Construction and Ownership of Centralia Steam Electric Generating Plant, § 23.

[6]"The Owners hereby appoint Pacific as the Operator of the Project on behalf of and for the account of all Owners. Pacific shall operate and maintain the Project, hire all Project personnel, pay all operating and maintenance expenses including labor payroll, fuel (except coal fuel), water, materials and supplies." Agreement for the Operation of Centralia Steam Electric Generating Plant, § 4(a).

ered later. If, under the state constitution, the ownership and operation of municipal facilities for the generation, distribution and sale of electric energy has now become one of the major functions of municipal government, may a governmental unit legally bargain away this function or delegate it to private corporations?

The delegation of power contemplated by these contracts extends to the handling of public money, too. In the operating contract, as in the construction contract, the operator, Pacific Power, "will pay all operating and maintenance expenses of the Project and reimburse itself by drawing drafts or checks as required upon the 'Centralia Plant Operating Trust Account' established by the Operator and funded by the Owners." Should the fund become insufficient to take care of the operating and maintenance costs, each "Owner will within 24 hours deposit in said trust account its percentage share" as stated in the ownership agreement, for the purpose of maintaining the trust account at a minimum level of $25,000.

Operations and maintenance costs mean the costs of all services performed by Pacific Power applicable to the operation and include employees' payroll, social security taxes, unemployment insurance, hospital medical insurance, pension funding, workmen's compensation, material and supplies, costs of purchased power, traveling expenses, and payment for the use of Pacific Power's transportation equipment. Additionally, Pacific Power shall be reimbursed for administrative, accounting and general costs computed at a percentage of all project operation and maintenance expenses as defined in the contract. Thus, in addition to repaying Pacific Power for all operating and maintenance costs advanced, the publicly-owned utilities will be paying to Pacific Power their respective percentages of a management fee for directing and controlling the operation of the entire project. To the extent that the two cities and the two public utility districts are bound to contribute this money, they have lost control over their own treasuries and management of their own properties.

The third of the major agreements is the coal supply

agreement. Washington Irrigation and Development Company and Western Resources, Inc., the two wholly-owned subsidiaries of Washington Water Power and Pacific Power & Light, in what is described as a joint venture, own, lease and have mining rights to the entire coal supply. These two subsidiaries agree to mine, sell and deliver and the four private and four public entities agree to buy from them all of the coal to be used as fuel in the Centralia thermal project. The coal supply lies in Thurston and Lewis Counties and is to be mined by open-strip mining methods and delivered to the generating plant site in uninterrupted quantities sufficient to keep the plant operating for the term of the contract. Expiring conditionally at 12:01 a.m., September 1, 2006, the coal supply agreement thus runs to a term of more than 35 years. Ownership of the coal supply will not be shared; the two subsidiary corporations will retain it throughout the term of the contracts. Along with the water supply agreement and the other two contracts, the coal supply agreement thus places the four governmental agencies in direct participation with activities vitally affecting the ecology of the district. The contracts will create a joint responsibility and liability for controlling air and water and land pollution and erosion, and before the last ton of coal has been burned, will impose upon them all duties and costs not yet dreamed of relating to maintaining the ecology of the state.

The price of the coal is an enigma. The coal supply contract, section 6, captioned "Base Price Revision," says:

> Seller [the two subsidiaries which own or contract all the coal] agrees to mine and produce coal from the Centralia Coal Field in accordance with a good and workmanlike mining plan and by the use of modern equipment and methods to mine coal from said lands efficiently so as to supply the coal requirements of the Buyers according to the terms hereof.

Coal Supply Agreement, Centralia Thermal Project, § 6. Then follows about five pages of complex legal terminology describing the mathematical processes to be applied in computing the price of coal. According to the coal supply

agreement, the eight partners or joint venturers are not buying the coal at a fixed price nor upon competitive bids, but bind themselves instead to pay to the two subsidiaries of Washington Water Power and Pacific Power & Light a fluctuating price computed upon what is described in the contract as a base price or minimum of $0.16 per million BTU prior to the date commercial operations begin and $0.10 per million for delivery after the date commercial operation begins plus interest on "Such Buyer's Percentage Share of Four Hundred Seventeen Thousand Dollars ($417,000) per month commencing with the date of commercial operation, or other amount determined pursuant to paragraph 5(d)."

Ordinarily, a municipality or public utility district in buying fuel coal on contract for the generating of electricity would be obliged to conform to statutes and ordinances requiring open and competitive bidding. Not so, however, in these contracts. The price of coal which the four publicly-owned entities bind themselves to pay to the two wholly-owned subsidiaries of Washington Water Power and Pacific Power for the next 35 years or longer will, like the general costs of over-all operations, inevitably fluctuate from time to time, depending upon constantly changing costs of mining and delivery and varying management expenses. These costs must also include whatever expenditures will be necessarily incurred in maintaining, repairing and restoring the ecology—expenses which are bound to vary from time to time.

At page 15, the coal supply contract contemplates that disputes as to the price of coal will inevitably arise for it says that the seller—that is, the two wholly-owned subsidiary corporations—shall be entitled to "a reasonable fee for overheads and profit," and "If all parties hereto have not unanimously agreed on such a cost plus a fee basis for the price to be paid" prior to any proposed price increase, then a majority of the ownership is necessary to send the issue of the price of coal to arbitration or competitive bidding. Pacific Power and Washington Water Power, who together own 62.5 per cent of the voting power and the project and

all of the two coal-supplying subsidiaries, thus control the price of coal.

Should the price of coal rise, and a majority of the ownership demand that competitive bidding be invoked, the method of competitive bidding prescribed by contract in my opinion amounts to an unlawful delegation of legislative and executive power for, says the contract:

> Buyers and Seller shall each promptly nominate mining operators who have had regular and continuous experience in the strip mining of coal to whom invitations for bids shall be submitted, and invitations shall be sent to all such mining operators so nominated.

and

> [T]he specifications for bids shall require that the successful bidder shall acquire all of Seller's [subsidiaries'] buildings, facilities and equipment used for the production and processing of coal.

Coal Supply Agreement, Centralia Thermal Project, § 6 (f)(iv). Thus, it will take a majority of the ownership (1) to put the coal supply under competitive bid, and (2) the bidding will be limited to a class of producers described as "mining operators who have had regular and continuous experience in the strip mining of coal," and (3) who must contract to buy all of the buildings and facilities described. An ordinary coal supplier, producer or dealer or other entrepreneur could not bid, regardless of the amount and quality of coal he might have available.

Should the price of coal be challenged by a majority of ownership, the publicly-owned utilities have but two elections: (1) Putting it up for bids as described, and (2) submitting the issue to arbitration. The election of either procedure "shall be final and shall be binding upon all parties hereto."

If arbitration instead of competitive bid is demanded by a majority of the ownership, the arbitrator must be "a coal consultant or coal operator with broad experience in the coal mining business and with a national reputation." Should the parties fail to agree upon a coal consultant or operator of broad experience and national reputation then,

according to the contract, the District Court of the United States will find one, or failing this the Superior Court of the State for Lewis County will do so. Thus, the destiny of the four publicly-owned utilities as to the price of coal for the next 35 years will be under the direct control and dominion of (1) the two wholly-owned subsidiaries of Pacific Power and Washington Water Power which in turn own all of the coal or (2) the bidders limited to those with regular and continuous experience in open-strip coal mining who must include in their bids an undertaking to buy, and add to their bids the cost of the two subsidiaries' buildings, facilities and equipment used in mining and delivering the coal, or (3) the decision of an arbitrator who has to be a coal consultant or coal operator with broad experience in the coal mining business and who has a national reputation.

But on other occasions, this court has adhered to the principle of the constitution which explicitly and by necessary implication forbids the delegation of sovereign power. In *Port of Tacoma v. Parosa,* 52 Wn.2d 181, 324 P.2d 438 (1958), the court noted that "It is well established that legislative power may not be . . . delegated [to private persons]." In *State ex rel. Kirschner v. Urquhart,* 50 Wn.2d 131, 310 P.2d 261 (1957), a statute provided that accredited medical schools shall be those on a list promulgated by private agencies; the court held that this was a delegation of legislative power to the agencies and that the statute was invalid.

In *State ex rel. Everett Fire Fighters, Local 350 v. Johnson,* 46 Wn.2d 114, 278 P.2d 662 (1955), a city charter amendment attempted to provide that an arbitrator should determine wage disputes between the city and city employees. The court struck down the statute as an impermissible delegation of the city's legislative power—that of determining the propriety and terms of city contracts.

And, in *State v. Matson Co.,* 182 Wash. 507, 47 P.2d 1003 (1935), the legislature attempted to delegate to the director of agriculture and "a special privileged group of private persons" the power to regulate and to set standards for

marketing arrangements of food commodities. The delegation of power was held impermissible.

The manifest illegality of the coal supply agreement is equaled by the third major contract to be considered—the water supply agreement. In the water supply agreement, the roles of the parties are reversed. Here the four private corporations and the four publicly-owned utilities, unitarily designated as seller, undertake to supply water to what is described as a joint venture composed of Washington Irrigation and Development Company and Western Resources, Inc., the wholly-owned subsidiaries of Washington Water Power and Pacific Power, described as buyers. Thus, two corporations of the seller, owning 62.5 per cent of the Centralia thermal project and voting power in it, have in effect participated in formulating a contract with their own two subsidiaries which latter, in combination, own all of the coal to be supplied to the generating plant.

Seller, consisting of the eight utilities, public and private, as a solitary entity in the water supply contract, states that it has applied to the state for "rights to store and appropriate the waters of the Skookumchuck River, and to divert the Waters of such river" and to store 51,500 acre feet of it, and to release the stored water into stream and diversion and pumping at the rate of 80 cubic feet per second. Whether the two cities and the two public utility districts as public agencies of government would have preferential rights over the four private corporations to the use and storage of the water of the Skookumchuck does not appear in this record, and whether they have imparted to their private partners such preferential rights is equally a mystery. What is clear, however, is that in the water supply agreement, the four public power agencies inextricably commingle with the four private power companies their rights, privileges, immunities and priorities with respect to the state's waters and undertake to build and maintain the necessary facilities with which to extract 80 cubic feet per second from the Skookumchuck, and to sell this water to the two wholly-owned subsidiaries of two of the partners to

the enterprise, and to build, operate and maintain a water system with which to deliver the water.

In brief, the four publicly-owned utilities agree to use whatever priorities and rights they may have in the state's waters in amounts necessary to furnish "the water requirements of Buyer's coal washing facilities in addition to Seller's Generating Plant," and in sufficient quantities "for use in washing and treating coal and other uses related to the mining and processing of coal or industrial utilization of coal and coal products." But that is not the limit to their obligation. If the buyer—a joint venture or partnership of the two wholly-owned subsidiaries of Pacific Power and Washington Water Power—requires "additional water for the processing of coal or for any industrial use which shall utilize coal from the coal fields owned or controlled by Buyer and whether such coal is processed or utilized directly by Buyer, *or is sold to other persons or entities,*" (Italics mine.) buyer has the first option on all "uncommitted percentages of the capability of the Water Supply System."

The eight entities, private and public, according to their respective ownership interest, will jointly pay all preconstruction and construction costs of the water supply system, including engineering, labor, contractor's fees and costs of material and equipment. These costs include expenses for arranging and supervising construction—which latter costs, I think, will ultimately be paid to Pacific Power as operator, although, in my opinion, one cannot be certain of this from a reading of the water supply contract.

The buyer—the two wholly-owned subsidiaries—as a singular entity, agrees to accept and pay for the water supplied at the rate of 12½ per cent of the "Seller's monthly fixed cost of the Water Supply System," the monthly fixed cost to be computed according to formulas set forth in the contract. These amounts, that is, the price received by the four private and four publicly-owned utilities as their aliquot share from the sale of water to their partners' wholly-owned subsidiaries is bound to fluctuate. The four public agencies are thus selling water for the next 35 years

through the two subsidiaries to two of their copartners who own a controlling voting interest in the entire enterprise, at no fixed schedule of rates but on a price basis that will likely fluctuate from year to year and perhaps month to month, and at a rate which will no more than cover the costs involved, although the water may be used by the subsidiaries in the production of profit through coal sales to other buyers.

The water supply contract gives the seller (singular) at all reasonable times the right "to enter upon the premises of Buyer to inspect the water-receiving equipment" and the buyer a corresponding right to inspect seller's water supply system and its books and records relating to its construction, operation, maintenance and control—hardly more than a gesture either way because the buyer is a wholly-owned subsidiary of Pacific Power and Washington Water Power which together are majority owners of seller. Ownership of any interest in the water supply system cannot be transferred or assigned except in insolvency proceedings or to secured creditors save "with the consent of all other parties, which consent shall not unreasonably be withheld." Thus, if Seattle, Tacoma, or the two public utility districts decide in the future to generate power by enlarging their own systems, or by building new plants or to establish new thermal generating facilities using oil, natural gas or other fuels—even nuclear energy—they will be in no position to withdraw from the water supply agreement or from the other three major agreements, or to liquidate their investment in the project except with the consent of their privately-owned competitors, who not only have a strong majority ownership but have the effective control, direction and management of it.

Again, as with the other contracts, in disputes arising from the water supply agreement concerning its operation and meaning, the publicly-owned utilities have unconstitutionally contracted away their access to the courts and are obliged to arbitrate for "The award of the arbitrator so chosen shall be final and binding upon all the parties." It is well settled that the delegation of legislative functions of

municipal corporations to individuals, as arbitrators, is constitutionally impermissible. *State ex rel. Everett Fire Fighters, Local 350 v. Johnson,* 46 Wn.2d 114, 278 P.2d 662 (1955). Only a duly constituted public official may exercise a governmental function—not a private individual. *Port of Tacoma v. Parosa,* 52 Wn.2d 181, 324 P.2d 438 (1958).

All parties to this action, including the four publicly-owned entities, represented to the court that the electric power to be generated by the Centralia thermal project is surplus power and will not be needed by the City of Tacoma, City of Seattle, Grays Harbor Public Utility District No. 1, or Snohomish County Public Utility District No. 1 until the year 1982. They all thus agree that the total output will go first to the United States and its agencies, such as the Bonneville Power Administration of the Department of Interior and the Central Valley Project of the Bureau of Reclamation, until 1982, and second to Pacific Power. Accordingly, under the "disposition of Output Agreement" the four publicly-owned utilities undertake to sell their share of the 426.9 MW to the Central Valley Project of the Bureau of Reclamation until June 1, 1982; Bonneville Power will buy any remaining output above the 426.9 MW only to April 1, 1974. After that date, any of the project output over the 426.9 MW committed to the Bureau of Reclamation will be purchased by Pacific Power, the copartner and operator in exclusive control of the project. Just what price the federal government and Pacific Power will pay for their power from the project during the interval ending in 1982 is not clear to me from the record and I can find nowhere that the learned trial judge was presented with that point or that he made any finding or decision concerning it. In this fashion, the four public utilities bind themselves to sell a substantial percentage of their total electric power on an irrevocable commitment for 10 years to two separate agencies of the United States and to Pacific Power at a rate not yet ascertained and which, when established, is bound to fluctuate from time to time. Presumably after 1982, under management, direction and control of Pacific Power, the output will be distributed at cost to the

eight owners in accordance with their respective ownership interests—the cost to include management fees to Pacific Power.

Thus, in addition to the broad aspects of illegality and unconstitutionality under the state constitution, such as the prohibitions against the lending of credit or giving of property to a private corporation and precluding the ownership of an interest in a private corporation by a municipal corporation as pointed out in the dissenting opinion, and the illegal amalgamation of or delegation of governmental sovereignty to private corporations as earlier noted, there appear other and more specific symptoms of unconstitutionality. The entire scheme, RCW 54.44, and the contracts made under it, in my opinion, are not only repugnant to the constitution as a whole but violate it in several other specific particulars. I think they violate Const. art. 1, § 8, which says that "No law granting irrevocably any privilege, franchise or immunity, shall be passed by the legislature."

Tenancy in common and partnership as contemplated by these contracts is irrevocable and inseparable for the next 35 years or until the coal supply runs out. This court, in *North Springs Water Co. v. Tacoma,* 21 Wash. 517, 58 P. 773 (1899), when the state constitution was young, held that, even though the City of Tacoma granted a franchise to a private corporation to supply water to the residents of Tacoma, because of this provision (Const. art. 1, § 8), the city was not precluded by the franchise from thereafter building and operating its own water system in competition with the franchised corporation. The contracts in the present case, however, require the two cities and the two public utility districts to participate in the purchase of coal from, the sale of water to, and the joint generating of power with its joint-venturing private corporations. There is no way under these contracts, short of an overt breach or repudiation of the contract, by which the publicly-owned entities can divorce themselves from the scheme, buy coal or other thermal fuel on the open market and compete with their co-partners in the thermal generation and sale of power within the districts and areas covered by these contracts.

I agree with the court that the constitution is not a grant but rather a limit on the law-making power, but this is no more than a judicial rule of construction and does not delimit the effect of the express declaration that the provisions of the constitution are mandatory. Const. art. 1, § 29. If, as the constitution states, its provisions are mandatory, these contracts operate to grant not only special privileges in violation of it, but irrevocable ones at that. Article 1, section 8, captioned "Irrevocable Privilege, Franchise or Immunity Prohibited," declares: "No law granting irrevocably any privilege, franchise or immunity, shall be passed by the legislature." The constitution thus flatly declares that, if a statute purports to grant an irrevocable privilege, franchise or immunity, it is void. In allowing the joint acquisition, construction and operation of nuclear and thermal electric power generating plants, RCW 54.44 does precisely what this provision forbids.

As long as the project shall last, the statute and contracts engender an irrevocable commingling of the public treasury with that of private corporations; they irrevocably transfer exclusive powers of government relating to the ownership, control and operation of governmental power to private corporations by an inextricable commingling of them. And, as long as the thermal project shall last, the scheme creates an irrevocable alliance between public agencies and private agencies for the joint acquisition and use of public permits, franchises and easements essential to construction and operation of a thermal generating project and the sale and distribution of its output. The contracts thus amount to an irrevocable granting of the state's dominion over a substantial segment of water, land and air of this state. They constitute, therefore, I believe, the granting of an irrevocable privilege—or franchise, in effect—to the four private corporations and their two subsidiaries.

So emphatic is the constitution on the prohibitions set forth in article 1, section 8, that essentially the same caveat is repeated in article 1, section 12, which declares:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges

or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

RCW 54.44 does precisely what this section enjoins; it purports to empower an inextricable commingling and joinder of governmental authority, money and function with private corporations in the building, ownership and operation of thermal generating plants and the sale of their output. RCW 54.44 is not a statute authorizing the mere purchase or sale of power supplies and services from or to private corporations. Applying an obvious analogy, if this statute is not held repugnant to article 1, sections 8 and 12, the identical provisions could be enacted and carried out with respect to many other functions of government, whether governmental, proprietary, or mixed, such as the ownership, construction and operation of the public schools, maintenance of highways, water systems, sewage systems, operation of courts, police departments, state hospitals and the many other institutions of government. Would the courts under our state constitution uphold a similar statute allowing, for example, the joint construction, ownership and operation of the public schools? Or municipal police departments? Or the public parks?

This raises another point and invokes another provision of the state constitution, forbidding all municipal indebtedness unless it be exclusively for municipal purposes. In 1952, the people of this state amended the constitutional provision concerning municipal debt, while retaining its major features. Article 8, section 6, then and as amended contains this salient proviso:

> *Provided,* That no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes . . .

Amendment 27. This provision goes to the very core of the issue presented by this case. It allows the cities and public utility districts to contract for goods and services on the one hand but forbids partnerships with the contracting parties on the other. It is the one thing to incur an indebtedness for the outright purchase or sale of power and another

to incur it for the purpose of forming a partnership with private business.

Regardless of how well meaning the proponents of the plan may have been in designing it and contracting to achieve it, the ownership, construction and operation of the Centralia thermal project and sale of its output cannot reasonably be said to constitute *strictly* a municipal purpose. The word *strict* must be given effect; it cannot be treated as surplusage. When employed in a constitution, the word *strict* is about as strong a term as can be used—short of usual legal redundancies—to place a limitation upon something; it is not found in even the Bill of Rights, federal or state. *Strictly,* when used in a constitution is, I think, at least the legal equivalent of such all-encompassing expressions as "neither directly nor indirectly," or "nor under any circumstances whatever," or of the familiar caveat, "Positively, this means you." To give it the significance to which it is entitled, as the courts are obliged to do, it means that the people of the state, as shown in other provisions, too, had a fear of commingling the public treasury and powers of government with private persons or corporations. Whether rightly or wrongly, and even though groundless or illusory, it is clear from the whole constitution and its several specific provisions that the people feared that such a commingling would inevitably result in the emergence of what has lately come to be known as the corporate or corporative state—a state dominated, controlled and directed by great corporations under which the inexorable forces of economics and politics would work to the ultimate transference of public authority, money and property, to the great corporations for their special benefit.

The legitimate and basic purpose of a private business corporation, whether directly regulated or not, and however described, is to make a profit for its shareholders and officers. Without profit, a private business corporation will not survive; profit is the main object of its existence. Even though it may aspire to benevolence and good works, profit is the sine qua non of the creation and existence of a private business corporation. Conversely, the very purpose

of government is to provide for the protection, safety, welfare and peace and freedom of all the people. See Preamble to the Constitution of the United States, and Const. art. 1. Thus, whereas all property of a private corporation is directed, managed and controlled by the corporate officers for the benefit of the shareholders to whom the former owe a fiduciary duty, and whose interests they are obliged by law to honorably serve, the property of the state and its subdivisions is held in trust for and managed, directed and controlled by its officers for the benefit of all of the people resident within or moving into the jurisdiction of the unit of government, and indirectly all people of this country. While there may at times be an identity of interests between the shareholders and officers of a corporation and the residents at large of a governmental unit, this as a matter of law, I fear, is largely coincidental and one not to be claimed as a tenet of constitutional law. What is good for Pacific Power here is not necessarily good for the people of Tacoma and Seattle and the residents of Snohomish and Grays Harbor Counties.

So clear is the intentment of this proviso limiting the incurrence of municipal debt *strictly* to municipal purposes (Const. art. 8, § 6), that since statehood no case has arisen where the public and municipal purpose could be doubted. Thus, condemning a right of way for a projected ship canal by the federal government (*Lancey v. King County,* 15 Wash. 9, 45 P. 645, 34 L.R.A. 817 (1896)); construction of a county road (*Rust v. Kitsap County,* 111 Wash. 170, 189 P. 994 (1920)); joint expenditures by county and city for construction of a bridge (*Grant v. Evans,* 163 Wash. 484, 1 P.2d 852 (1931)); and construction of a publicly-owned bridge across Lake Washington (*State ex rel. Washington Toll Bridge Authority v. Yelle,* 56 Wn.2d 86, 351 P.2d 493 (1960)), all involved debts created for explicit and *strictly* governmental purposes, undiluted by any suggestion of private participation.

Significantly, in *State ex rel. Washington Toll Bridge Authority v. Yelle, supra,* this court disposed of the issue with a flat recital of 10 reasons why a toll bridge to be built

by a state agency, the Washington State Toll Bridge Authority, would be *strictly* a county purpose:

> The argument is made that the construction of a second toll bridge across Lake Washington is not a county purpose within the first proviso of the twenty-seventh amendment to the state constitution, which is as follows:
>
> "*Provided,* That no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes . . ."
>
> The resolution identifies at least ten county purposes. They are accurately summarized in plaintiff's brief . . .

Although these cases might be said to constitute a negative kind of authority, I think it significant that since statehood no case which even remotely suggests that public indebtedness can be incurred for the purpose of going into business with private corporations has arisen under this specific proviso enjoining upon municipalities strict municipal functions.

That the functions of city government are limited by the state constitution to purely public purposes and cannot be transferred to or diluted with private corporate functions is also established in Const. art. 11, § 11, authorizing the delegating of police powers from the state to counties, cities and townships:

> Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws.

This section is a direct delegation of police power to a political subdivision of the state. *In re Sound Transit Co.,* 119 Wash. 684, 206 P. 931 (1922); *Continental Baking Co. v. Mount Vernon,* 182 Wash. 68, 44 P.2d 821 (1935). That this power may not be delegated to private persons or corporations is shown, I think, in *Storey v. Seattle,* 124 Wash. 598, 215 P. 514 (1923), which upheld a city ordinance appointing a county humane society as the city's official poundmaster, and permitting the society to retain 85 per cent of the

animal license fees. This court sustained the ordinance on the direct basis that the ordinance did not delegate the police power to a private corporation in violation of Const. art. 11, § 11.

We said, at page 601:

These provisions of the ordinance are questioned upon the ground of their constitutionality; the first contention in that behalf being that they unlawfully delegate a portion of the police powers of the city to the humane society named.

and answered, at page 602:

*But we cannot agree with the appellant that the King County Humane Society is a private corporation.* This society is organized under the provisions of §§ 3184 to 3200, of Rem. Comp. Stat. [P. C. §§ 1957, 1973]. Under the provisions of Rem. Comp. Stat., § 3185 [P. C. § 1958], thereof, its officers, members and agents, duly designated by the trustees of the society and approved by a judge of the superior court, are peace officers, and have the powers of peace officers in matters relating to the cruelty to animals. They are also empowered to make arrests without warrants in certain cases; to appear in court and prosecute cases in the name of the state; and by Rem. Comp. Stat., § 3197 [P. C. § 1970] it is provided that all fines collected in any county for the violation of the state laws relating to cruelty to animals shall be paid to such society. Nor can we agree that the ordinance delegates to the society any part of the police powers of the city. It seems to us that, instead of delegating such a part, the city is but making use of a public corporation, created by state law, to enforce its penal laws relating to the regulation of cats and dogs.

(Italics mine.)

Similarly, in *State ex rel. State Humane Soc'y v. Hovey,* 159 Wash. 584, 294 P. 258 (1930), we affirmed this holding that a county humane society "is in its substance and effect a public corporation." We cited *Storey* with approval in *Roehl v. Public Util. Dist. 1,* 43 Wn.2d 214, 240, 261 P.2d 92 (1953), in a case testing and upholding the power of five *public utility districts* to buy, acquire and jointly operate the generating and distributing facilities of a privately-

owned electrical company and to make public employees of the new employees under the state retirement system. The rationale of *Roehl* depends on the fact that the public utility districts are *publicly owned and operated* 'and that their functions and power may not be delegated to private persons or corporations. The contracts in the present case and the statute under which they were reached (RCW 54.44), provide for an extensive delegation of legislative and administrative power to the private power companies—powers which in essence are analogous to the police power.

So rigid is the constitution against the consolidation of governmental power and function with those of private business that this state entered the Union with a constitutional provision expressly forbidding anyone from making a private profit out of public funds. As earlier noted, Const. art. 11, § 14, provides:

The making of profit out of county, city, town, or other public money, or using the same for any purpose not authorized by law, by any officer having the possession or control thereof, shall be a felony, and shall be prosecuted and punished as prescribed by law.

This does not mean that those who contract with a municipal corporation to sell it materials, supplies and services are bound to forego a profit, but it does, I think, ordain that public money and property cannot be turned over to private entities for the particular purpose of operating their business. It is one thing to buy the materials and supplies or services and pay for them and another to invest in the contractor's business. Thus, where a municipality may buy the goods and services, it cannot, under this provision, buy into the private business which produces them.

All public officers are thus under a specific duty, according to article 11, section 14, to deposit all public moneys to the credit of the municipality and for its benefit, and to distribute none of it to private corporations except in payment for services, supplies and merchandise particularly contracted for. Neither of these provisions of the state constitution (article 11, sections 11 and 14), contemplates nor sensibly countenances the joint ownership and operation of

a public utility nor a participation in a special revolving trust account as prescribed by these contracts, funds to be withdrawn only upon order of Pacific Power which has management and control of the project.

Another section buttresses this idea, for Const. art. 11, § 15, explicitly forbids the handling of public money in the manner contemplated by these contracts, as follows:

> All moneys, assessments and taxes belonging to or collected for the use of any county, city, town or other public or municipal corporation, coming into the hands of any officer thereof, shall immediately be deposited with the treasurer, or other legal depositary to the credit of such city, town, or other corporation respectively, for the benefit of the funds to which they belong.

The revolving trust account, under the control and dominion of Pacific Power and to which the public entities must from time to time contribute, violates this provision.

There next should be considered the question of monopoly. One feature of the contracts which, in my opinion, should be submitted to the trial court is whether they will foster a monopoly. The state constitution declares:

> Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties, and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchises.

Const. art. 12, § 22. Laws against monopoly do not apply to government. This is so because under our theory of representative democracy is the idea that government is the servant of all. Constitutional provisions, statutes and decisional law prohibiting monopolies, trusts and combinations in restraint of trade and commerce ought not, therefore,

apply to the government or its political subdivisions. Public utility districts, as subdivisions of the state and wholly public instruments of government, are not to be inhibited by existing legislation nor the constitutional provision defining and prohibiting monopolies and combinations in restraint of trade. *State ex rel. Northwestern Elec. Co. v. Superior Court,* 28 Wn.2d 476, 183 P.2d 802, 173 A.L.R. 1351 (1947); *State ex rel. Dep't of Pub. Works v. Inland Forwarding Corp.,* 164 Wash. 412, 2 P.2d 888 (1931); *Uhden, Inc. v. Greenough,* 181 Wash. 412, 43 P.2d 983, 98 A.L.R. 1181 (1935). But constitutional provisions against private monopolies are to be liberally construed for they are intended to safeguard the public against private monopolies from whatever direction they may come. *Group Health Coop. v. King County Medical Soc'y,* 39 Wn.2d 586, 638, 237 P.2d 737 (1951). There are three elements to an unconstitutional monopoly: (1) a combination or contract (2) dealing with a product or commodity (3) the purpose of which is to fix prices, limit production or regulate transportation. *Group Health Coop. v. King County Medical Soc'y, supra;* 36 Wash. L. Rev. 239, 241 (1961).

The Consumer Protection Act, RCW 19.86, augments this constitutionally declared policy against monopolies and trusts. Although the act does not apply to business enterprises under direct state regulation, it does provide standards for dealing judicially with such enterprises when they act in concert, or combine and confederate to establish a monopoly or trust. *See* Consumer Protection Act, RCW 19.86, generally and specifically RCW 19.86.030, which declares unlawful "Every contract, combination, *in the form of trust or otherwise,* or conspiracy in restraint of trade or commerce . . ." (Italics mine.); RCW 19.86.040 makes any attempt to effect a monopoly illegal; and RCW 19.86.150 provides for the dissolution of corporations and suspension or forfeiture of their franchises for doing either.

We do not know whether or to what extent the combination described as the Centralia thermal project will dominate the sale of coal, the generation, sale and distribution of electric power in Western Washington, or preempt the wa-

ters of the Skookumchuck, for these points were not raised. Nor does the record disclose to what extent the two subsidiary corporations, Western Resources, Inc., and Washington Irrigation and Development Company, in a nonregulated industry, have a monopoly on fuel coal in this area, or whether the eight partners in combination by virtue of these contracts will take steps to stifle the rise of competitors either in the sale or distribution of electric power or in obtaining nuclear or hydropower for the future. But even without a claim of or proof specifically directed to the creation of a monopoly, the record, I think, discloses a likelihood that these contracts will create one.

Size alone is not to be ignored in assessing the likelihood of monopoly. As Mr. Justice Cardozo said in *United States v. Swift & Co.*, 286 U.S. 106, 116, 76 L. Ed. 999, 52 S. Ct. 460 (1932):

> Their low overhead and their gigantic size, even when they are viewed as separate units, would still put them in a position to starve out weaker rivals. Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly . . . but *size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past.*

(Italics mine.)

It is common knowledge that the Cities of Tacoma and Seattle own and operate electrical generating and distributing equipment and own property which would cost more than a billion dollars to duplicate and that the four private power companies would be among the corporate giants of the industry by state, if not national, standards. The size and territorial exclusiveness of the two public utility districts are not so well known, but one can assume that they are relatively substantial. Singly, each legal entity appears, if not to dominate the market in its area, at least to share it with no more than one other large entity. In concert, the eight utilities obviously present such a massive combination of economic power and licensing as to virtually

preempt the electric power field in Western Washington. While these ideas were not explored in the case, in my opinion they should have been. It would be a hardy city, public utility district, cooperative, or private corporation indeed that would undertake to enter the power generating and distributing field in the face of such a gigantic combination.

Many of these same questions have arisen recently with respect to banking mergers and the application of judicial antitrust standards. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963). Under the bank merger act of 1966, 12 U.S.C. § 1828 (c) (7) (D), which incorporated the general decisional law applicable to other industries and commerce generally, it is held that if in the public interest the anticompetitive effects are not outweighed by probable beneficial effects of the merger, then the merger will not be permitted. *United States v. Phillipsburg Nat'l Bank & Trust Co.,* 399 U.S. 350, 26 L. Ed. 2d 658, 90 S. Ct. 2035 (1970). Reversing a decree in *Phillipsburg* which had allowed the merger of two banks, the court applied all of the tests which are applicable generally to the issues of unlawful monopoly, antitrust, and the stifling of competition: (1) The extent of the product market generally; (2) the relevant geographic market; (3) the anticompetitive effects of the merger; and (4) meeting the convenience and needs of the community (or geographic area to be served).

If, as is contended here, the power generated by the Centralia project will be surplus power to the four public utilities until 1982, then, even though the combination or merger might thereafter be deemed a benefit to the community interests, the question of monopoly and anticompetition should be evaluated in the light of whether the gain to the public interest could reasonably have been achieved through other means. The Supreme Court, in speaking of bank mergers and declaring a rule I think applicable here, in *United States v. Phillipsburg Nat'l Bank & Trust Co., supra,* at 372, cites with approval its statement in *United*

*States v. Third Nat'l Bank,* 390 U.S. 171, 19 L. Ed. 2d 1015, 88 S. Ct. 882 (1968), as follows:

We held in *Nashville Bank, supra,* at 190, that "before a merger injurious to the public interest is approved, a showing [must] be made that the gain expected from the merger cannot reasonably be expected through other means."

Prima facie, then, if we are permitted to draw upon common knowledge, the record does present the signal components of a monopoly: (1) an economically significant geographic area in which the products are traded; (2) a size of presumably dominant proportions accompanied by a latent intent to exercise the power resulting from size (*American Tobacco Co. v. United States,* 328 U.S. 781, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946)); (3) a capability of excluding actual or potential competition from the field or to control prices. All that is lacking from the record is proof of (4) an intent to exercise the power described in (3). Judicial safeguards should have been erected to prevent the emergence of this fourth component. *See* 36 Wash. L. Rev. 239, 250 (1961).

Although economic domination cannot be assessed with mathematical precision, the field is not without some standards. Thus, in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945), it was held that control of 90 per cent of the relevant market constituted monopoly but that 60 per cent would not. In *United States v. United Shoe Mach. Corp.,* 110 F. Supp. 295 (D. Mass. 1953), *aff'd per curiam,* 347 U.S. 521, 98 L. Ed. 910, 74 S. Ct. 699 (1954), 75 per cent control of the market, coupled with an intent to dominate it constituted a monopolization. *See,* generally, *United States v. Columbia Steel Co.,* 334 U.S. 495, 92 L. Ed. 1533, 68 S. Ct. 1107 (1948). One of the tests for monopoly is the availability of substitute products within the relevant market area (*United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 100 L. Ed. 1264, 76 S. Ct. 994 (1956)), a sensible rule which presents no problems here except as to fuel coal, for if there is a substitute for electric power, I have yet to hear of it. And no showing whatever was made

that the promised gain to the public interest, or claims made along that line, could not be accomplished through merger and combination of the publicly-owned utilities or by expanding and increasing their generating capacities.

Although the constitutional and statutory provisions and decisional law against monopoly do not apply to the state or its political subdivisions, the violation of the rules against monopoly is compounded, I think, when the state's own agencies combine with private business to create one. When the state and its political subdivisions and agencies combine with private business to engender a monopoly or stifle competition, they are not only failing to carry out the mandates of the constitution and the legislature to move against monopoly, but have actually taken affirmative action to foster one. This I believe they have done in combining with four private corporations in the purchase and marketing of fuel coal within a relevant area and in the sale and distribution of electric power in a larger but equally relevant area.

Finally, I think there should be considered two other aspects of what seems to me to be apparent illegality in these contracts: (1) violation of the statutes, charters and ordinances requiring that both the cities and public utilities purchase their materials through publicly advertised competitive bidding; and (2) circumvention of the civil service laws. As to competitive bidding, the contracts provide that the two cities and public utility districts are committed to the purchase of coal for the next 35 years on the basis of fluctuating prices. If, as earlier pointed out, disagreement concerning the price arises, it takes a majority of ownership to call either for bids or arbitration. Should a majority of ownership call for arbitration, the award is final. If bids are called for, the bidding is limited to national coal producers who must agree to buy the coal mining facilities and equipment owned and used by the two subsidiary corporations who own and control the coal fields. I think these provisions are directly repugnant to RCW 54.04.070, which requires that before public utility districts enter into any contract for work, services and materials, they must "pub-

lish a notice at least thirty days before the letting of the contract, inviting sealed proposals", and observe the mechanics of calling for bids, opening them and awarding the contracts as prescribed by RCW 54.04.080.

Similarly, the charter of the City of Seattle, art. 8, § 16, requires competitive bidding in the purchase of materials of over $1,000 in value, as follows:

> Before making any purchase or sale, the purchasing agent shall be required to secure bids under such rules and regulations and subject to such exceptions as the council may by ordinance prescribe.
>
> All expenditures for supplies, materials or equipment involving more than such amount as may be specified by ordinance shall be made on written contract. All such contracts shall be awarded to the lowest and best bidder, after public advertisement as may be prescribed by ordinance.

Seattle Charter, art. 8, § 16. Seattle Code 2.04.040 specifies that "All expenditures for supplies, materials and equipment the estimated cost of which is in excess of one thousand dollars" shall be in accordance with a published notice "inviting sealed competitive bids." And the City of Tacoma charter requires "Competitive prices or bids for all purchases . . . involving the expenditure of three thousand dollars or more." Tacoma Charter, art. 7, § 7.11, along with Tacoma Municipal Code, ch. 1.06, which prescribes the procedure for carrying out the charter mandate.

Nor should the relationship of this scheme to the civil service systems of Seattle and Tacoma be ignored. Seattle Charter, art. 16, and Tacoma Charter, art. 6, establish civil service departments; they require that all city employees, except a few specifically exempted, or to be exempted, shall be classified into and become members of the classified civil service. Civil service laws are enacted not only for the protection of the employees but for the benefit of the city as a whole. They provide that officials and employees of the city who build, repair, transport, operate and maintain facilities and equipment, machinery and records utilized in generating, distributing and selling electric power,

are with few exceptions members of and entitled to the protection and benefits afforded by the classified civil service and contemplate that these are public benefits, too.

Just how many employees who would ordinarily occupy a classified civil service position will be required to operate and maintain the Centralia thermal generating project is not disclosed by the record, but it can be assumed, I think, that the number represented by the ownership interests of Seattle and Tacoma would not be insignificant. Both the people of Seattle and Tacoma and their officials and employees are entitled to the benefits of the classified civil service which the contracts in issue serve to cancel.

The scheme embodied in these contracts is not merely to buy electricity or other products, or to sell them outside the respective city boundaries as authorized by RCW 35.84.010, but requires the direct expenditure and commingling of city money with privately-owned business entities in carrying out functions of government long undertaken by the two cities. In expending between them approximately 25 million dollars of public money—not including interest to be paid or the bonds to be sold—for the purchase of land, equipment, machinery and services, all of which will be maintained and operated by personnel in the employment and under the direction, supervision and control of Pacific Power, and outside the classified civil service of both municipalities, the two cities have violated their respective charters and circumvented the classified civil service systems.

I see no rational distinction between governmental and proprietary functions of government in this area affecting the civil service. If the two city governments can in this fashion farm out the operation and maintenance of their facilities and equipment to private corporations in the field of electric power, they and other municipal corporations and districts can do so with respect to other functions of government such as furnishing water, maintaining and repairing streets, operating and maintaining public buildings, libraries and even public schools, and providing police and fire protection.

I think the statute, RCW 54.44, and the contracts in issue made thereunder setting up joint ownership, operation and maintenance and doing business as a partnership among four private corporations and four publicly created, owned and operated governmental entities are unconstitutional, invalid and void. I therefore dissent.

ROSELLINI, J., concurs with HALE, J.

